Commonwealth *v.* Barnes & Tucker Company.

Argued January 6, 1972, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*Stanley R. Wolfe,* Special Assistant Attorney General, with him *Richard B. Springer,* Assistant Attorney General and *K. W. James Rochow,* Assistant Attorney General, for plaintiff.

*Cloyd R. Mellott,* with him *C. Arthur Wilson, Jr., Richard C. Seamans, John R. Kenrick, Frank A. Sinon, Eckert, Seamans, Cherin & Mellott* and *Rhoads, Sinon & Reader,* for defendant.

OPINION BY PRESIDENT JUDGE BOWMAN, April 16, 1973:

By complaint in equity the Commonwealth seeks a mandatory injunction requiring Barnes & Tucker Company (B & T), a Pennsylvania corporation, to treat acid mine drainage discharging from Lancashire Mine No. 15 so long as such discharge does not meet minimum water quality standards, and which substandard quality of the discharge is expected to continue for the foreseeable future. B & T, the last operator of Mine 15, denies any legal responsibility for the discharge or its treatment under any one or more of the legal theories advanced by the Commonwealth in support of the relief sought.

Twelve days of hearings have produced a record of over 1400 pages of testimony and more than 250 exhibits, which record in turn has produced almost 200 requests for findings of fact and conclusions of law by the Commonwealth and over 300 on the part of B & T.

By agreement of counsel and leave of court the case has been argued on the facts and the law before the court en banc and assigned to the Chancellor for adjudication.

In narrative form we shall set forth the history, background and events out of which this litigation arose and which is deemed essential to the legal issues raised. This narrative will encompass the majority of undisputed and common facts requested to be found by both parties. Facts essential to the legal issues which are in serious dispute as between the parties on grounds of relevancy, or of materiality or which are the subject of conflicting evidence will be specifically treated.*

### Location and History of Mine No. 15

Mine No. 15, a bituminous deep coal mine, is located in the "B" or Lower Kittanning seam of coal in an area of Cambria County and Indiana County, Pennsylvania, known as the Barnesboro Basin. The Barnesboro Basin is an area bounded on the east by the Laurel Hill Anticline, on the west by the Nolo Anticline, on the south by unmined coal, and on the north by the West Branch of the Susquehanna River. The Laurel Hill Anticline and the Nolo Anticline represent the highest points of the Basin in terms of elevation. The lowest portion of the Basin which lies between those two anticlines is known as the Barnesboro Syncline. At the southerly end of the Basin, the Barnesboro Syncline is in unmined coal. From that point, it progresses eastwardly to a mined area in a mine known as the

---

* Rulings reserved during the trial on objections to evidence are set forth in an appendix attached hereto and incorporated herein by reference thereto, as are requests for findings of fact and conclusions of law made by the parties but not adopted by the Chancellor.

Colver Mine and then northwardly into Mine No. 15. It then progresses through the length of Mine No. 15 into a mine known as Springfield No. 4 and then out the northern end of the Basin. Most of the area of Mine No. 15 is located in the Barnesboro Syncline and is located in the lowest portion of the Barnesboro Basin. It contains approximately 6,600 acres.

The driftmouth of Mine No. 15 is located near Bakerton on the West Branch of the Susquehanna River at an elevation of approximately 1,531 feet. A drift opening in a mine is an opening which is made at a point where the coal seam in which the mine is located outcrops at or near the surface of the ground.

From the point where the driftmouth of Mine No. 15 is located at the outcrop of the "B" seam of coal near the West Branch of the Susquehanna River, the "B" seam of coal slopes downward in a southwesterly direction.

The earliest mining in Mine No. 15 was in the year 1915 and was done in the northeasterly section of the mine at or near where the "B" seam of coal outcrops near the West Branch of the Susquehanna River. From that point, the mining in Mine No. 15 was done to the dip, that is, from the highest point of elevation in the mine at the outcrop down the slope of the "B" seam in a southwesterly direction to the lowest area of the mine which is at an elevation of approximately 1,230 feet.

Mine No. 15 was first operated by the Watkins Coal Co. under the name "Watkins No. 3." In 1916, the operation of the mine was taken over by the Watkins Coal Mining Co., and the mine was operated by that company under the name "Watkins No. 3" through the year 1922. In the year 1923, the operation of the mine was taken over by the Pennsylvania Coal and Coke Corp., which operated the mine under the name "Penn-

sylvania No. 18." The mine was idle during the years 1924 and 1925. In 1926, the mine began to be operated by the Barnes Coal Co., which continued to operate the mine through the year 1938. In 1939, B & T acquired the assets of Barnes Coal Co. and took over the operation of Mine No. 15.

During the entire period of its operation, the total amount of coal produced from Mine No. 15 was 29,010,-131 tons. Of that total production, 25,388,414 tons were produced prior to January 1, 1966, and 3,621,717 tons were produced after January 1, 1966. The annual production of coal from the mine beginning with the year 1960 is as follows:

| Year | Annual Tons of Production |
|------|---------------------------|
| 1960 | 824,923 |
| 1961 | 861,051 |
| 1962 | 1,164,885 |
| 1963 | 1,581,043 |
| 1964 | 1,697,283 |
| 1965 | 1,747,435 |
| 1966 | 1,464,946 |
| 1967 | 1,056,759 |
| 1968 | 886,726 |
| 1969 | 213,286 |

The portion of Mine No. 15 known as the breakout area is located on the West Branch of the Susquehanna River at a point where the "B" seam of coal is within approximately fifty feet of the surface of the land.

During the final four years of operation of Mine No. 15 (1966-1969) 3,621,717 tons of coal were mined having a net sale value at $18,198,631 and resulting in a pretax profit of $2,777,608.

Less than 10% of the total area of Mine No. 15 was mined after January 1, 1966 and the area mined after

that date was in the southwesterly part of the mine and was at an elevation 100 feet to 215 feet lower than the coal elevation at the breakout area, with the majority of such mining having at least 150 feet to 200 feet below the coal elevation at the breakout area. Less than 40% of the area of Mine No. 15 that was mined after January 1, 1966 was mined after October 1, 1967.

If the area of Mine No. 15 mined after January 1, 1966 had not been so mined, the breakout of mine water which occurred in the summer of 1970 along the West Branch of the Susquehanna River near its driftmouth would still have occurred.

Coal was last removed from Mine No. 15 on May 10, 1969. Sealing procedures and removal of equipment were completed at later dates.

On May 10, 1969, there was still mineable coal in certain areas of Mine No. 15, but B & T ceased operation of the mine for the reason that it could not economically afford to pump and treat the water that it would have had to pump from the mine to continue to operate the mine.

There is no intention on the part of B & T to reopen Mine No. 15 or to resume the operation of that mine.

After May 10, 1969, B & T proceeded to complete the construction of bulkhead seals between Mine No. 15 and Mine No. 24-B and to seal the other openings in Mine No. 15.

The construction of the bulkheads between Mine No. 24-B and Mine No. 15 and the sealing of Mine No. 15 by B & T were done in accordance with the requirements of the Department of Mines and Mineral Industries of the Commonwealth in effect at the time the construction and sealing were done. Concrete seals

were not used as provided for by special condition of a permit hereinafter referred to.

The driftmouth of Mine No. 15 was sealed with a type of seal known as an air seal which comported with requirements of the Department of Mines and Mineral Industries. An air seal is a seal which will allow water to flow out of a mine but at the same time will prevent the entry of air through the seal into the mine.

Until January, 1971, the agency of the Commonwealth responsible for the regulation and control of the sealing of coal mines was the Department of Mines and Mineral Industries. Since then, the responsibility has been vested in the Department of Environmental Resources.

Some time prior to September 24, 1969, B & T filed a closing or abandoned mine map of Mine No. 15 with the Department of Mines and Mineral Industries in Harrisburg. On this map, the notation appears— "Abandoned May 10, 1969." That notation was written on that map by Everett Pennington, then an employee of the Department of Mines and Mineral Industries whose responsibilities included receiving and filing "abandoned" bituminous mine maps.

### THE CERTIFICATE AND PERMIT HISTORY OF MINE NO. 15

Prior to the Act of May 8, 1945, P. L. 435, amending the so-called Pure Streams Act of June 22, 1937, P. L. 1987, 35 P.S. §691.1 et seq., the statutory law of Pennsylvania did not require the operator of a coal mine to obtain a certificate or permit with respect to the discharge of mine waters into the streams of the Commonwealth.

After the 1945 Act became effective and implemented, a "Certificate of Approval of Mine Drainage" was

issued by the Sanitary Water Board to B & T for Mine No. 15, which certificate was dated July 22, 1948 and bore the number 892. By this certificate the Board approved a plan of mine drainage and disposal whereby discharge from the mine would be pumped at three pumping stations and discharged into the West Branch of the Susquehanna River without any requirement of treatment or provision for post-mining discharge. It did, however, contain the following condition:

"When in the opinion of the Board, because of changes in the volume or character of the drainage or the time or manner of disposing of it, or the changed use or condition of the receiving stream, the herein approved disposal of mine drainage ceases to be satisfactory to the Board, then upon notice by the Board, the right herein granted to discharge such drainage shall cease and become null and void and, within the time specified by the Board, the Owner, Operator or Lessee shall adopt such remedial measures as, in the opinion of the Board, will be satisfactory."

Based upon an application of B & T dated January 5, 1960, on March 25, 1960, a new permit for mine drainage and industrial waste disposal was issued by the Board for Mine No. 15. Under this permit, bearing the number 14326 (sometimes referred to as 19124-M, apparently because the application was assigned that number), the Board approved a change of plan of mine drainage for Mine No. 15 whereby the drainage would be pumped from the mine at the Duman pumping station located at the southwest end of the mine at its lowest elevation point and discharged into Crooked Run, a tributary of Elk Creek, which flowed to the North Branch of Black Lick Creek and then to the Conemaugh River, being headwaters of the Allegheny River. There was no requirement in this permit for the treatment of the mine drainage nor any provi-

sion for post-mining discharge. This permit superseded Certificate No. 892.

On September 15, 1964, B & T filed an application for a new mine drainage permit for Mine No. 15 and for two new coal mines which were being opened by it, one of which was Lancashire Mine No. 24-B in the "B" seam of coal; and the second of which was Lancashire Mine No. 24-D in the "D", or Lower Freeport, seam of coal. The proposed plan of drainage for Mine No. 15 was the same as that which had previously been covered by Permit No. 14326, that is, to pump the water from the mine at the Duman pumping station. In addition, B & T proposed to drain water from Mine Nos. 24-B and 24-D into Mine No. 15 for pumping and discharge at the Duman pumping station.

As disclosed by the application, substantial drainage from this complex of mines was anticipated to be 6.5 million gallons per day and water quality varied from an expected alkaline state as to drainage from Mine No. 24-D to that of high acid and iron content in the other areas of the mining complex.

On December 21, 1964, a new permit bearing No. 564M5 (also sometimes referred to as 564M005) was issued by the Board to B & T approving the plan of proposed mine drainage as submitted. There was no requirement in this permit that the drainage be treated nor was there any provision for post-mining discharge or the treatment thereof. This permit superseded permit No. 14326. However, under legislation then in effect (1945 amendments) treatment of the discharge would have been required had the streams into which the discharge was to flow not been "unclean" streams.

We here note parenthetically that the actions of the parties as to permit No. 564M5 before and after the effective date of the 1965 amendments to The Clean

Streams Law[1] and the issuance of a new permit to B & T under the new legislation (permit No. 567M035, *infra*) are matters of great dispute and controversy as between the parties and directly bear upon the statutory law to be considered as governing this case.

The certificate and permit history continues by specific findings of fact.

1. On May 25, 1966, pursuant to Section 315(d) of the 1965 amendments to The Clean Streams Law, B & T, on a form furnished by the Commonwealth, applied for an extension of time to operate under its mine drainage permit No. 564M5 which, as then in effect, covered Mines Nos. 15, 24-B and 24-D. As previously noted, while substantial drainage from the mining complex was anticipated and provided for by a pumping facility at Duman Dam, and the quality of drainage was generally of high acid and iron content, no requirement for treatment of the drainage had been imposed nor provision made for post-mining discharge.

2. Representations made in the body of the May 25, 1966 application and an attached "Summary Report" recognized continued high volume of discharge from the mining complex and its high acid and iron content. It was further represented that the discharge was to be treated and there were set forth two alternative plans for treatment and a time schedule for completion of treatment facilities.

---

[1] Act of August 23, 1965, P. L. 372, effective January 1, 1966, discussed *infra*, which radically altered the existing law on the subject of mine drainage discharges into the waters of the Commonwealth. Section 315(d) provided that previously issued mine drainage permits "shall be deemed to be a permit issued pursuant to this section . . . [and] shall be valid for one year . . . or for such additional periods as the board might allow." The amendment also gave the legislation the short title of "The Clean Streams Law."

3. By letter dated November 2, 1966, the Board granted an extension of permit No. 564M5 to November 1, 1968, ". . . to complete mining operations covered by your Permit . . . subject to the following stipulations:

"1. That you abide by Conditions numbered 3, 4, 6, 7 & 27 of the 'Standard Conditions Accompanying Permits Authorizing The Operation of Coal Mines' as adopted by the Sanitary Water Board on January 19, 1966, which shall be attached to and made a part of your Permit No. 564M005.

"2. That you report to the Regional Sanitary Engineer giving the status of your abatement project, at the times set forth in Item 18 of your Application for an Extension of Time."

4. On November 8, 1966, B & T formally accepted and agreed ". . . to abide by the special added conditions incorporated into and made a part of . . ." permit No. 564M5.

5. The special conditions of possible relevancy referred to are:

"THREE: No silt, coal mine solids, rock, debris, dirt and clay shall be washed, conveyed or otherwise deposited into the waters of the Commonwealth.

"SIX: The permittee shall notify the reporting agency by certified mail that he has completed operations within fifteen (15) days after mining is completed.

"SEVEN: Whenever, because of an accident or otherwise, a discharge not allowed by the permit occurs, the permittee shall immediately telephone the reporting agency to report such incident and shall promptly take such steps as are necessary to halt the unauthorized discharge."

6. On the form supplied by the Commonwealth for an extension of time for a *pre*-1965 amendment permit

is an item (No. 18) for a schedule of completion of certain steps including "Final Plans and Application" to which B & T responded by indicating the date of March, 1967.

7. By letter dated March 13, 1967, B & T acknowledged its responsibility under the time extension granted with respect to permit No. 564M005 to ". . . submit final plans and application for new mine drainage permit . . . during March 1967" but because of needed additional pilot plan studies, further time was needed to September, 1967.

8. On or about October 17, 1967, B & T filed an application for a mine drainage permit on a form prescribed for *post*-1965 amendment permits which application pertained to both Mines Nos. 15 and 24. On March 22, 1968, permit No. 567M035 was issued in response to this application subject to terms and conditions hereinafter set forth.

9. As part of its application resulting in issuance of permit No. 567M035 there was attached an engineering report to which was later added an addendum estimating the volume of drainage from both mines. It was also disclosed for the first time that the closing of Mine No. 15 was contemplated and it estimated a substantially reduced drainage after construction of bulkheads and the inundation of Mine No. 15 upon cessation of mining in that mine. The report, however, represented the contemplated construction of a treatment system for mine drainage to meet minimum water quality standards and related subjects of pumping capacity, storage basins, methods of treatment and sludge removal and disposal.

10. Permit No. 567M035, as issued, was subjected to certain designated standard conditions and contained the specific proviso that B & T comply with ". . . all representations regarding operation, construc-

tion, maintenance and closing procedures as well as all other matters set forth in [its] application and its supporting documents." Pertinent standard conditions incorporated into the permit were:

"(6) 'The permittee shall notify the reporting agency [Department of Health] by certified mail that he has completed operations within fifteen (15) days after mining is completed.'

"(7) 'Whenever, because of an accident or otherwise, a discharge not allowed by the permit occurs, the permittee shall immediately telephone the reporting agency to report such incident and shall promptly take such steps as are necessary to halt the unauthorized discharge.'

"(8) 'The permittee shall fully comply with the mine closure procedures set forth in the plan for drainage in an expeditious manner after mining has been completed.'

"(10) 'The permittee shall at no time discharge to the waters of the Commonwealth mine drainage from any source the pH of which is less than 6.0, or greater than 9.0.'

"(11) 'The permittee shall at no time discharge to the waters of the Commonwealth mine drainage from any source containing a concentration of iron in excess of 7 milligrams per liter.'

"(12) 'The permittee at no time shall discharge to the waters of the Commonwealth mine drainage from any source the acid content, of which . . . exceeds its alkaline content. . . .'

"(27) 'Monthly operation reports shall be submitted to the Board through the reporting agency on forms supplied by the agency. Such reports shall be submitted promptly after the end of each month.' "

11. On May 6, 1968 (approximately six weeks after issuance of permit No. 567M035), B & T by letter to

the Department sought a further extension of time to operate under permit No. 564M5 from November 1968 (the expiration date of the first extension granted to that permit) to April 1969. In this letter B & T represented it was in the process of isolating and sealing Mine No. 15 under supervision of the Department of Mines and Mineral Industries and upon completion and the inundating of the mine discharge from that mine at Duman Dam (and another discharge point under another permit not here relevant) would be completely eliminated until some future time when pumping would be resumed incident to mining of the "D" seam.

12. These plans represent a departure from the closure and drainage plans submitted by B & T in conjunction with its application for permit No. 567M035 in that the former contemplated and provided for high volume drainage and its treatment prior to closure of Mine No. 15 and reduced drainage and treatment at Duman Dam after closure of Mine No. 15, presumably from Mine No. 24 also covered by that permit.

13. Prior to granting the further extension sought with respect to permit No. 564M5 and in response to a departmental request, B & T submitted a map of the Mine No. 15 "B" seam and other information which represented in part that "[t]here will be no water pumped from this inundated area of the 'B' seam (Lower Kittanning), and all access points to this mine will be sealed with concrete. This includes portals, boreholes, shafts, etc. which will be completely isolated and there will be no sampling points. . . . Any water pumped to the surface . . . will be that which will be developed in the 'D' seam. . . ."

14. This reply letter of B & T referenced its request, the department inquiry and its reply to permit No. 567M035 (post-1965 amendment permit) rather than to permit No. 564M5.

15. By letter dated July 18, 1968, the Board advised B & T that it was granted a further extension of time to April 30, 1969, to complete mining operations covered by permit No. 564M5 subject to the same special conditions as imposed with respect to the first extension (F.F. 5). An acceptance form enclosed with the letter was accepted by B & T.

16. By letter of April 14, 1969, B & T requested a third extension of time from April 30, 1969, to May 20, 1969, of permit No. 564M5, assigning as the reason for the request a coal strike in the area.

17. By letter dated April 30, 1969, the Board granted the requested further extension for discharge from Mine No. 15 covered by permit No. 564M5 subject to the same conditions as imposed incident to the first extension granted and restated in the second extension. An acceptance form identical to those accepted by B & T with respect to the prior two extensions was enclosed but never accepted and returned to the Board by B & T.

18. By interoffice memo within B & T, it was suggested that the acceptance form not be returned or be delayed in return to suit the convenience of B & T and the closing of Mine No. 15.

19. The last two extensions of permit No. 564M5 were sought by B & T and granted by the Board after application for permit No. 567M035 had been made by B & T and issued by the Board.

20. The last two extensions of time granted by the Board as to permit No. 564M5 were issued by the Board with knowledge that B & T was in the process of discontinuing the operation of Mine No. 15 upon completion of the program of isolating, sealing and inundating that mine as disclosed in the various documents submitted, and that there would be no antici-

pated discharge at the Duman Dam discharge point when the program was completed.

21. The mining of coal in Mine No. 15 ceased on May 10, 1969. However, after that date additional time was employed in removing equipment and constructing barriers and sealing operations which was consistent with Board policy of permitting additional time beyond the termination date of an extended permit for this type of activity.

22. By letter dated July 2, 1969, B & T advised the Department that all equipment would be removed and sealing of Mine No. 15 completed in approximately two weeks.

23. The closing of Mine No. 15 was completed in late July 1969, pumping at Duman Dam facility was terminated and the mine began to flood (inundate) as anticipated.

24. All procedures incident to sealing and closing Mine No. 15 met Department of Mines and Mineral Resources requirements but all access points were not sealed with concrete as represented by B & T would be done in its material submitted to the Board incident to its application for permit No. 567M035.

25. Construction of a treatment facility at Duman Dam by B & T for treatment of drainage from the mining complex as represented by B & T in its various applications for extension of permit No. 564M5 and its application for permit No. 567M035 had not been undertaken at the time of final closure of Mine No. 15.

26. After Mine No. 15 had been closed, samplings of water level of the mine taken by B & T disclosed a rising water level in the mine. A later sampling indicated a level of 1,515 feet. At an elevation of 1,524 feet the pool level would be at the same elevation as the driftmouth of the mine posing a threat of discharge

from the driftmouth to the West Branch of the Susquehanna River.

27. B & T did not advise the Department of the rising elevation of the mine pool. During this period it did confer with the Department of Mines and Mineral Industries concerning gas pockets developing in the flooding mine and a borehole was made to relieve this condition. This particular borehole was made at the point at which water level readings were made.

28. In the latter part of June 1970, a breakout occurred at the northeast end of Mine No. 15 which triggered this litigation as more fully set forth in the History of this Proceeding, *infra*.

29. There is no evidence in this case nor has any claim been asserted by the Commonwealth that B & T, or any of its predecessor operators of Mine No. 15, conducted mining operations contrary to applicable law then in effect or contrary to certificate No. 892, permits No. 14326 or No. 564M5 prior to any extension thereof.

30. In applying for the three extensions with respect to permit No. 564M5 and for permit No. 567M035, B & T did not intentionally violate or intend to deceive the Department or Board concerning any regulation, guideline or request of the Department or Board with respect to the submission of information, data, maps or other documents incident thereto.

31. That the meaning or interpretation of certain regulations or guidelines as understood by the staff of the Department or Board differed from the meaning or interpretation placed upon them by representatives of B & T is insufficient to find B & T as intending to deceive or mislead the Department or Board.

32. The Commonwealth, through its departments and agencies having jurisdiction over mining and mine drainage, was possessed of sufficient information, if

utilized, to determine the advisability of granting and the imposition of appropriate conditions to extensions sought by B & T of permit No. 564M5 and the granting of permit No. 567M035 to assure compliance with the statutory law then in effect and regulations promulgated thereunder.

33. Both the Commonwealth and B & T share responsibility for the confusion and uncertainty surrounding the issuance of two extensions of permit No. 564M5 after permit No. 567M035 had issued.

### Events Leading to and History of This Proceeding

In late June 1970, there was discovered a substantial discharge of acid mine water drainage into the West Branch of the Susquehanna River from the Buckwheat borehole of Mine No. 15 located at the northeast end of this mine, which condition prompted the Board to issue an order dated July 7, 1970 suspending B & T permit No. 567M035 (the post-1965 amendment permit issued March 22, 1968 covering both Mines Nos. 15 and 24). The suspension was to remain in effect until (1) the Buckwheat borehole was plugged, (2) satisfactory treatment facilities were placed in operation and (3) satisfactory plans for prevention of pollution after cessation of mining had been submitted.

As a matter of fact mining of Mine No. 15 had ceased at least one year before the date of this suspension order, and pumping of mine discharge at the Duman Dam facility had been discontinued soon thereafter.

The suspension order, whatever its intended effect or legal effect may have been or was, did produce discussions between the Board and representatives of B & T which culminated in a Board order dated July 16, 1970, reinstating permit No. 567M035 subject to added

special conditions and acceptance by B & T of the special conditions modifying the permit.

The special conditions set forth in the reinstatement order provide, *inter alia*, that:

"A. The company shall submit complete plans for the treatment of the discharge from the Lancashire Mine #15 by September 1, 1970, and shall maintain the discharge within limitations required by Board regulations.

"B. The company shall submit complete plans for the prevention of pollution after mining operations have ceased. Such plans shall be submitted no later than December 31, 1970."

Prior to the July 16, 1970, reinstatement order of permit No. 567M035, the Buckwheat borehole had been plugged (condition 1 of the suspension order of July 7, 1970), but the pool level in Mine No. 15 was rising to a level which threatened a discharge from a portal in the general vicinity of the Buckwheat borehole now plugged. This problem was a subject of the discussions leading to the reinstatement order. Proposals were made by B & T to construct relief boreholes (to become known as the Maberry borehole) and build treatment facilities in that area for the liming of any discharge. The reinstatement order followed.

The Maberry borehole was constructed and treatment of its discharge began, but on July 23, 1970, another substantial discharge from Mine No. 15 through the earth's surface was discovered in the vicinity of and south of the plugged Buckwheat borehole. This discharge point became known as the breakout area. The surface elevation at the breakout area is 1,495 feet, which is lower than that at the new Maberry borehole.[2]

---

[2] The quality and quantity of mine water discharge from Mine No. 15 at these two points was sharply disputed. It is not necessary

This new discovery precipitated another order by the Board dated July 28, 1970, again suspending permit No. 567M035, which order also provided, *inter alia*:

"2. On and after July 30, 1970, the Company is prohibited from operating the mine approved by the permit and is also prohibited from discharging mine drainage which does not meet . . . Board standards.

"3. The Company take immediate steps to prevent the acid discharge which emanates from Lancashire #15 mine from entering the West Branch of the Susquehanna."

Thereupon B & T ceased treatment of the discharge at Maberry which responsibility the Commonwealth assumed on August 22, 1970. In the meantime the Commonwealth filed its original complaint in equity in this case on August 7, 1970 and B & T appealed to this Court from the Board order of July 28, 1970, the most recent suspension of the mentioned permit.

As originally filed, the complaint in equity sought to enjoin preliminarily and permanently the operation of Mines Nos. 15, 24-B and 24-D and to require B & T to take immediate steps to provide adequate treatment of discharge from Mine No. 15. A hearing on the Commonwealth's application for preliminary injunction was fixed but before the scheduled date and after B & T had answered the complaint, a stipulation of the parties dated August 26, 1970 was filed in this proceeding and presented to the Court which accepted the stipulation, made it a part of the record but was not asked to and did not issue a preliminary injunction.

---

to resolve this dispute, however, as the evidence clearly discloses the quantity to be substantial, exceeding a million gallons per day. Its acidity level was in excess of minimum water quality standards as clearly recognized by both parties in providing for and undertaking to treat the discharge with a liming process to reduce its acidity.

Designed to provide a temporary solution to the problem pending determination of the litigation, the stipulation provided that the Commonwealth would continue its liming treatment of the discharge from No. 15 into the West Branch until B & T in accordance with specifications contained in the stipulation constructed and commenced operation of the Duman Dam pumping and treatment facility at the southwest end of the mine from which the treated discharge would flow into the headwaters of the Allegheny River watershed. It was expected that the pumping operation at Duman Dam would terminate the discharge at the Maberry borehole and breakout area at the northeast end of the mine.

Among the provisions in the stipulation, B & T agreed to operate the Duman Dam facility for a period of at least thirty days after which period it could, on five days notice to the Commonwealth, terminate operation of the facility.

In accordance with the stipulation, B & T constructed a treatment facility at Duman Dam and commenced the operation of that facility on November 1, 1970. It operated the facility from November 1, 1970 to February 22, 1971, on which date it ceased operating the facility after having given the Commonwealth five days prior written notice of such termination in accordance with the stipulation.

Within hours after B & T commenced operation of the Duman Dam facility on November 1, 1970, the discharge at the Maberry borehole location ceased.

On or about February 11, 1971, after the operation by B & T of the Duman Dam facility for over 100 days, the water level in Mine No. 15 was lowered to an elevation below the breakout area, and there has not been any significant discharge at that location since that date.

Another provision of the stipulation was one providing for administrative determination of the responsibility of B & T for abatement of pollution deriving from the discharge of Mine No. 15 and the legality of the suspensions to permit No. 567M035. Administrative adjudication has never taken place partly because of the demise of the Sanitary Water Board upon creation of the Department of Environmental Resources and partly because the original cooperation and concern of the parties as evidenced by the stipulation gave way to bickering and dispute.

On February 19, 1971, after B & T had given notice of its intent to discontinue the operation of the Duman Dam facility on February 22, 1971, the Commonwealth filed a Petition for Injunctive Relief in this proceeding pursuant to which it sought a special injunction, without hearing, requiring B & T to continue to operate the Duman Dam facility and a preliminary injunction, after hearing, requiring B & T to continue to operate the facility pending a final decision based upon an administrative hearing which was then scheduled for March 2, 1971.

On February 19, 1971, this Court entered an order denying the Commonwealth's request for a special or ex parte preliminary injunction and fixed February 25, 1971 as the date for a hearing on the Commonwealth's request for a preliminary injunction.

On February 22, 1971, B & T ceased operating the Duman Dam facility, and its operation was taken over by the Commonwealth.

On February 25, 1971, this Court entered an order rescheduling the date for the hearing on the Commonwealth's application for a preliminary injunction for March 5, 1971 and directing that the administrative hearing fixed for March 2, 1971 be stayed.

The hearing on the Commonwealth's request for a preliminary injunction commenced on March 5, 1971 and was completed on March 25, 1971.

On March 17, 1971, the Commonwealth filed an amended complaint which consisted of four counts. In the first count, the Commonwealth sought relief against B & T on the same basis as alleged in its original complaint, that is, on the basis of orders issued by the Sanitary Water Board. In the last three counts of the amended complaint, the Commonwealth sought relief on the basis of new legal theories not raised in its original complaint.

On March 31, 1971, B & T filed its answer to the amended complaint.

On April 13, 1971, this Court issued a preliminary injunction providing for the continued operation of the Duman Dam facility pending the final determination of the case upon its merits, with the parties sharing the costs of such operation on an equal basis. Under the order, the expenditures of the parties incurred by reason thereof were to follow the final judgment in the case and be recovered by the successful party.

### Statutory History of Clean Streams Legislation in Pennsylvania

Before stating, discussing and resolving the legal issues raised in this litigation a recital of the statutory history of clean streams legislation in Pennsylvania will better focus the legal issues to the facts of the case.

The Act of June 22, 1937, P. L. 1987, 35 P.S. §691.1 et seq., now known as The Clean Streams Law, as variously amended, is the current statutory law on the subject of clean streams. Prior to its enactment in 1937, there was in effect in Pennsylvania in the year 1915

(the year in which Mine No. 15 was first operated) the Act of April 22, 1905, P. L. 260, known as the Purity of Waters Act. This legislation regulated the discharge of sewage into the waters of the Commonwealth but significantly provided in Section 4 that the act was not to apply to "waters pumped or flowing from coal mines. . . ."

In 1923 the Act of June 14, 1923, P. L. 793, was enacted which empowered the Advisory Board of the Department of Health to promulgate orders and regulations for the protection of the water supply and the prevention of pollution. This act also provides that it was not to apply to ". . . any pollution or contamination caused by or resulting from water pumped or flowing from coal mines or water used in the preparation of coal."

These acts remained in effect until repealed by the original enactment of The Clean Streams Law, but the special status accorded mine drainage into the waters of the Commonwealth was conditionally continued. As originally enacted, Section 310 of The Clean Streams Law specifically excluded from the provisions of Article III—Industrial Wastes ". . . acid mine drainage from coal mines until such time as, in the opinion of the Sanitary Water Board, practical means for the removal of the polluting properties of such drainage shall become known." There is no evidence that such a determination was ever made by the Sanitary Water Board prior to its demise.

In 1945 The Clean Streams Law was extensively amended by the Act of May 8, 1945, P. L. 435. The definitional section of the act (Section 1) was amended by redefining "establishment" to include coal mines, and "pollution" was broadened in meaning to include discharges from coal mines; Section 309, imposing penalties for discharge of industrial wastes into the waters

of the Commonwealth, was amended to include acid mine drainage within its provisions.

However, equal application of the provisions of the act to coal mines and mine drainage as imposed with respect to industrial wastes and sewage generally was not to be accorded. Section 310, which previously excluded from its coverage acid mine drainage from coal mines, was amended, *inter alia*, to read:

"Except as hereinafter provided, the provisions of this article shall not apply to acid mine drainage from coal mines until such time as, in the opinion of the Sanitary Water Board, practical means for the removal of the polluting properties of such drainage shall become known.

"It shall be unlawful and a nuisance to discharge or to permit the discharge, of acid mine drainage (1) into 'clean waters' of the Commonwealth which are being devoted or put to public use at the time of such discharge; or (2) into 'clean waters' of the Commonwealth, unless the Commonwealth, after the Sanitary Water Board has approved plans of drainage pursuant to section three hundred thirteen hereof, and has set a reasonable time not to exceed one year within which such pipes, conduits, drains, tunnels or pumps as may be necessary to receive such acid mine drainage at the point or points where such acid mine drainage is delivered, as provided in this section, shall be constructed and put into operation by the Commonwealth, has failed to construct and put into operation the same within such time: Provided, That nothing in this amendatory act shall be construed to limit or affect the provisions of section seven hundred one of the act to which it is an amendment."

And a new Section 313 was added which provided, *inter alia*, as follows:

"Before any existing or new coal mine may be opened or reopened, and before any existing coal mine may be continued in operation, a plan of the proposed drainage and disposal of industrial wastes, and acid mine drainage of such mine, shall be submitted to the Sanitary Water Board, and it shall be unlawful to open or reopen any such mine, or to continue the operation of any mine, or to change or alter any already approved plan of drainage and disposal of industrial wastes, and acid mine drainage from such mine, unless and until the board, after consultation with the Department of Mines has approved such plan or change of plan. . . ."

Certificate No. 892 and permits No. 14326 and No. 564M5 were issued under the provisions of The Clean Streams Law as amended by the 1945 amendments.

The 1965 amendments to The Clean Streams Law enacted by the Act of August 23, 1965, P. L. 372, are critical amendments with respect to several legal issues raised in this case. As previously noted, the significance of and application of the 1965 amendments to the extensions of time granted under permit No. 564M5 and the issuance of permit No. 567M035 under the 1965 amendments is a source of great dispute between the parties.

The 1965 amendments, generally speaking, eliminated the distinction between and different treatment accorded the discharge of acid mine drainage into "clean" and "unclean" waters of the Commonwealth and gave the Sanitary Water Board regulatory powers over all such discharges.

By adding a new Section 4 the General Assembly found that preexisting law had failed to prevent an increase in the miles of polluted water of the Commonwealth, that prior special provisions for mine drainage, a major cause of stream pollution, discriminated

against the public interest, that its polluted waters jeopardized the economic future of the Commonwealth and that clean unpolluted streams are essential to such future development. It also declared as a matter of policy that not only prevention of further pollution is essential but also the restoration and reclamation of polluted waters was equally essential.

To implement these findings and policy declarations acid mine drainage was brought within the definition of industrial waste. Thus discharge of acid mine drainage became subject to Section 307 of the Act. That section as originally enacted in 1937 provided in part:

"No person shall hereafter erect, construct or open, or reopen or operate, any establishment which, in its operation, results in the discharge of industrial wastes which would flow or be discharged into any of the waters of the Commonwealth and thereby cause a pollution of the same, unless such person shall first provide proper and adequate treatment works for the treatment of such industrial wastes, approved by the board, so that if and when flowing or discharged into the waters of the Commonwealth the effluent thereof shall not be inimical or injurious to the public health or to animal or aquatic life, or prevent the use of water for domestic, industrial or recreational purposes. . . ."

The 1965 act also added a new Section 315, which reads:

"(a) Before any coal mine is opened, reopened, or continued in operation, an application for a permit approving the proposed drainage and disposal of industrial wastes shall be submitted to the Sanitary Water Board. The application shall contain complete drainage plans including any restoration measures that will be taken after operations have ceased and such other information as the board by regulation shall require.

"(b)   It shall be unlawful to open, reopen, or continue in operation any coal mine, or to change or alter any approved plan of drainage and disposal of industrial wastes, unless and until the board, after consultation with the Department of Mines and Mineral Industries, has issued a permit approving the plan or change of plan.   A permit shall not be issued if the board shall be of the opinion that the discharge from the mine would be or become inimical or injurious to the public health, animal or aquatic life, or to the use of the water for domestic or industrial consumption or recreation.   In issuing a permit the board may impose such conditions as are necessary to protect the waters of the Commonwealth.   The permittee shall comply with such permit conditions and with the rules and regulations of the board.

"(c)   The board may modify, suspend or revoke any permit issued pursuant to this section.   Such action may be taken if the board finds that a discharge from the mine is causing or is likely to cause pollution to waters of the Commonwealth or if it finds that the operator is in violation of any provision of this act or any rule or regulation of the Sanitary Water Board. An order of the board modifying, revoking or suspending a permit shall take effect upon notice from the board, unless the order specifies otherwise.   Any party aggrieved by such order shall be given the opportunity to appear before the board at a hearing at which the board shall reconsider its order and issue an adjudication, from which the aggrieved party may appeal in the manner provided by the 'Administrative Agency Law,' act of June 4, 1945 (P. L. 1388), as amended. The right of the board to suspend or revoke a permit is in addition to any penalty which may be imposed pursuant to this act.

"(d) Any permit approving the drainage and disposal of industrial wastes from a coal mine and issued by the board prior to the effective date of this act shall be deemed to be a permit issued pursuant to this section. The permit shall be valid for one year from the effective date of this act or for such additional period as the board might allow. Nothing herein shall limit the board's power to modify, suspend, or revoke any such permit under the provisions of subsection (c) of this section."

Although the most recent amendments to the Act postdate the events of this case, the changes effected have bearing upon several issues raised. These latest amendments are found in the Act of July 31, 1970, P. L. 653. Section 315 was again amended and contains this significant provision:

"A discharge from a mine shall include a discharge which occurs after mining operations have ceased, provided that the mining operations were conducted subsequent to January 1, 1966, under circumstances requiring a permit from the Sanitary Water Board under the provisions of Section 315(b) of this act as it existed under the amendatory act of August 23, 1965 (P. L. 372)."

Finally, note should be made of legislation enacted in 1955 and 1965 dealing with the problem of pollution of the waters of the Commonwealth by mine drainage from abandoned mines. Shortly after the 1965 amendments to The Clean Streams Law were passed, legislation was enacted which required the Commonwealth to initiate a program for the correction of pollution from abandoned mines. Such legislation was contained in the Act of December 15, 1965, P. L. 1075, 35 P.S. §760.1, which provided as follows:

"The Secretary of the Department of Mines and Mineral Industries shall initiate an immediate action

program to correct pollution from abandoned deep and strip mines on each of the watersheds in the Commonwealth of Pennsylvania."

In 1955, both State and Federal funds were made available to enable the Commonwealth to discharge its obligations with respect to drainage from abandoned coal mines. Section 4 of the Act of July 7, 1955, P. L. 258, as amended, 52 P.S. §685, appropriated $8,500,-000.00:

". . . to match Federal moneys made available for the control and drainage of water from anthracite coal formations, to seal abandoned coal mines and to fill voids in abandoned coal mines. . . ."

Section 2 of this Act, 52 P.S. §683, provided that in the event matching Federal funds became available for this purpose, "[T]he Department of Mines and Mineral Industries shall . . . purchase and install pumps, pipes, machinery, equipment and materials for the purpose of pumping water from abandoned mines, and shall seal abandoned coal mines and fill voids in abandoned coal mines in those instances where such work is in the interest of public welfare. . . ."

Matching Federal funds were authorized in 1955 by the Mine Dewatering Act, Act of July 15, 1955, P. L. 87-818, as amended, 30 U.S.C.A. §571 et seq.

After the passage of the above-mentioned legislation in 1965, funds were made available for this program by The Land and Water Conservation and Reclamation Act, Act of January 19, 1968, P. L. (1967), 996, 32 P.S. §5101 et seq. This Act spoke specifically in terms of using such funds for the construction of treatment facilities by the Commonwealth. Thus, $150,000,000.00 was allotted under the Act to be used by the Commonwealth for this purpose and otherwise preventing, controlling and eliminating stream pollution from mine drainage.

## The Legal Issues

The Commonwealth poses the issues involved in five basic questions. In its counterstatement, B & T poses six basic questions, the first of which, by reason of its general nature, includes the first three questions posed by the Commonwealth. The Commonwealth's fourth question is within the scope of B & T's second question. The fifth and sixth questions posed by B & T—which encompass the fifth question of the Commonwealth—pose constitutional questions and issues of estoppel, laches and waiver against the Commonwealth which need not be considered because of our disposition of the case on other grounds.

Based upon our findings of fact, we view the legal issues to be within the first four questions posed by the Commonwealth and the first three posed by B & T and restate them to be:

1. Under the provisions of The Clean Streams Law then in effect, did B & T as a holder of time extended permit No. 564M5 or permit No. 567M035 (the 1965 amendment permit) assume responsibility for mine water discharge from Mine No. 15 after cessation of mining and thereby also become responsible for its treatment to meet minimum water quality standards established by the Commonwealth?

2. Did the mine water discharge emanating from Mine No. 15 impose any responsibility upon B & T for abatement of the polluting qualities of the discharge under Section 316 of The Clean Streams Law as then in effect?

3. Did the mine water discharge emanating from Mine No. 15 constitute a public nuisance under Section 3 of The Clean Streams Law as then in effect for which B & T is responsible and which it must abate?

4. Did the mine water discharge emanating from Mine No. 15 constitute a common law public nuisance

for which B & T is responsible and which it must abate?

DISCUSSION

*First Issue*

There can be no question that prior to May 8, 1945—the effective date of the 1945 amendments to The Clean Streams Law—there were no provisions in our relevant statutory law which specifically prohibited, regulated or authorized the administrative regulation of mine drainage discharge into the waters of the Commonwealth regardless of its polluting qualities or whether such discharges occurred during or after cessation of mining.

To the contrary, during the first thirty year period of the operation of Mine No. 15 by B & T and its predecessors, legislation on the subject of water pollution—however wise or unwise it might appear in retrospect—specifically excepted mine drainage from its coverage or from regulation.

In 1945, the Legislature first gave limited recognition to the reality that uncontrolled mine drainage discharge into the waters of the Commonwealth was inimical to an ultimate objective of pollution free waters. From 1945 to January 1, 1966—the effective date of the 1965 amendments to the Act—The discharge of acid mine drainage into "clean" waters of the Commonwealth was declared unlawful and to be a nuisance. To enforce this newly declared legislative policy, existing mines, reopened mines and newly opened mines were subjected to regulation through the requirement of obtaining approved plans of drainage from the Sanitary Water Board (Section 310, as amended, and Section 313, as added to the Act by the 1945 amendments). During this period, B & T operated Mine No. 15 under an approved plan of mine drainage into the West

Branch of the Susquehanna River and later into headwater streams of the Allegheny River basin under certificate No. 892, permit No. 14326 and permit No. 564M5 (also covering Mines Nos. 24-B and 24-D) without any requirement for treatment of discharge during or after cessation of mining.

Although not controlling nor directly on point in the legal issue under consideration, the decision of the Dauphin County Court in *Sanitary Water Board v. Sunbeam Coal Corporation*, 91 Dauph. 70, 47 D. & C. 2d 378 (1969), is worthy of notation here. In that case, the court was concerned with the issue of whether the Sanitary Water Board had the power, under the 1945 amendments, to deny a permit for an operating mine because of alleged violations of two other permits which had been issued by the Board to cover mines which were later closed. In holding that the Board did not have such power, the court stated:

"Of further significance is the fact that the Clean Streams Act specifically referred to mines being *opened, reopened or continued in operation.* Nowhere in the Clean Streams Act is it suggested or implied that a former operator of an abandoned mine can be held in 'violation' after the mine is closed. Even in the case of Sanitary Water Board v. Sunbeam Coal Corp., 77 Dauphin 264 (1961), wherein we held that future plans for the drainage of acid mine water after a mine closed could be required of an applicant at the time of originally applying for a permit, does not constitute authority for the proposition that an applicant can be held in 'violation' of a permit after the mine is closed, when he followed the plans approved by the board.

"Once the Sanitary Water Board has approved a drainage plan and the drainage plan has been followed, the responsibility of the operator ought not to be increased after the mine has ceased any longer to be a mine." (Emphasis added.) 91 Dauph. at 76-77.

Thus it has been judicially declared, and we believe correctly, that the 1945 amendments to the Act with respect to obtaining approved plans of mine drainage were applicable only to then operating mines, those reopened or newly opened ones, and if the approved plan was complied with, sanctions could not be imposed after cessation of mining for other "violations."

This brings us to the 1965 amendments to the Act. Their proper construction, the meaning of regulations promulgated thereunder and their application to the facts of this case are the prime issues in dispute. Although this case has received wide publicity and has been characterized as one of major importance in the environmental field, its unique facts surrounding the extensions granted under the pre-1965 amendments permit and the issuance of a 1965 amendment permit will make it of little precedent value for the future.

As previously noted, the 1965 amendments to the Act represented a major change of legislative policy towards the problem of mine drainage and pollution of the waters of the Commonwealth. Acid mine drainage was brought within the definition of industrial wastes and thereby becomes subject to Section 307 of the Act (last amended in 1945), which provides in part that "[n]o person shall hereafter . . . operate, any establishment which, *in its operation,* results in the discharge of industrial wastes which would flow or be discharged into any of the waters of the Commonwealth and thereby cause a pollution of the same. . . ." (Emphasis added.) For the first time then, the discharge of acid mine drainage into polluted waters was prohibited in Pennsylvania, *Pittsburgh Coal Company v. Sanitary Water Board,* 4 Pa. Commonwealth Ct. 407, 286 A. 2d 459 (1972).*

---

* Allocatur to Supreme Court granted March 24, 1972.

Of primary concern here is new Section 315 added to the Act by the 1965 amendments. Directly applicable to coal mines, it makes it unlawful to operate a coal mine without a mine drainage permit, the application for such a permit to "contain complete drainage plans including any restoration measures that will be taken after operations have ceased and such other information as the board by regulation shall require." The Board is also authorized to ". . . impose such conditions as are necessary to protect the waters of the Commonwealth." (Subsections (a) and (b) of Section 315).

Notwithstanding the declared change of legislative policy and the interdictions of Sections 307 and 315 against acid mine drainage pollution of our waters, subsection (d) of Section 315 afforded a limited exception to their application. It provided that any permit approving a mine drainage plan issued prior to January 1, 1966, ". . . shall be deemed to be a permit issued pursuant to this section . . . [and] shall be valid [until January 1, 1967] or for such additional periods as the board might allow."

The foundation of the Commonwealth's argument on this first issue rests upon B & T's application for and the issuance of a mine drainage permit under the 1965 amendments (permit No. 567M035). From this fact the Commonwealth reasons that B & T subjected itself to responsibility for the mine drainage from Mine No. 15 after cessation of mining because (a) Section 315 statutorily imposed such responsibility upon B & T, (b) the Board regulations and conditions attached to the permit imposed such responsibility, or (c) such responsibility would have been placed upon B & T by provisions of the permit had the Commonwealth not been misled or deceived by B & T incident to its issuance.

B & T counters by asserting that it never operated Mine No. 15 under the 1965 amendment permit but completed its operation and closed the mine under the pre-1965 permit as extended by law and further extended by Board action. It also argues that Section 315 does not statutorily impose such responsibility upon B & T nor do the regulations adopted thereunder.

Whether Mine No. 15 was operated during the critical period from January 1, 1966 to cessation of mining on or about May 31, 1969, under extensions of permit No. 564M005 or under permit No. 567M035, while a source of great controversy between the parties, is not in our opinion a controlling fact.

Rather, we view the first issue raised to turn on two essential questions. Did the 1965 amendments statutorily impose upon B & T responsibility for the post-mining discharge from Mine No. 15? If not, did the Act empower the Sanitary Water Board, as an element of an approved plan of drainage, to require a mine operator to assume responsibility for post-mining discharge? If so, then a further question of mixed law and fact arises as to whether or not B & T assumed such responsibility via its extensions of permit No. 564M005 or permit No. 567M035.

The 1965 amendments, while explicitly bringing mine drainage within the coverage of the Act as an industrial waste and equally explicitly requiring permits containing complete drainage plans for operating mines, are nevertheless silent on the subject of responsibility for mine discharges from then abandoned or closed mines or those thereafter closed.

As to its applicability, the title of the 1965 amendatory act required "permits for the *operation* of coal mines" and continued the scheme of the 1945 amendments, which applied to mine drainage discharge into "clean" waters of the Commonwealth. The language

found in subsections (a) and (b) of Section 315 is identical in substance to that contained in Section 313 of the Act as amended in 1945, and upon which the Court in the *Sunbeam* case relied in holding that the Act applied only to operating mines. Permits were required only as to a mine "opened, reopened or continued in operation." Without exception, throughout the 1965 amendments, they speak only to duties and responsibilities of operators and the power of the Board as to such operators.

Significantly, in the same year 1965, the Legislature recognizing the problem of mine drainage from abandoned mines to be a problem requiring State action if the legislative policy enunciated in the 1965 amendments was to be achieved, passed the Act of 1965 providing for a massive attack by the State itself with respect to mine drainage from abandoned mines.

Of greater significance, however, are the 1970 amendments to the Act. Section 315, as most recently amended, for the first time specifically addresses itself to the subject of responsibility for post-mining discharge. After prohibiting discharge of mine drainage into the waters of the Commonwealth without a permit or contrary to the rules and regulations of the Board, it then declares that "a discharge which occurs after mining operations have ceased" is subject to the regulatory powers of the Board.

In arguing that the 1965 amendments imposed statutory responsibility upon mine operators for mine discharge after a mine is closed, the Commonwealth primarily relies upon the last sentence of subsection (a) of Section 315 that a permit application contain a drainage plan "including *any* restoration measures that will be taken after operations have ceased." In this language we can find no such legislative intent, explicit or implied. At most, it arguably supports the

right of the Board to require a mine operator to assume responsibility for post-mining discharge as a condition to obtaining a permit under an approved mine drainage plan.

Considering the title of the 1965 amendatory act (*see Commonwealth v. Derstine*, 418 Pa. 186, 210 A. 2d 266 (1965); *City Stores Company v. Philadelphia*, 376 Pa. 482, 103 A. 2d 664 (1954), its limitation of reference to operators of coal mines and the 1970 amendments to the act, we are persuaded that prior to 1970 the *statute itself* did not impose responsibility upon mine operators for post-mining discharge.

Turning next to the question of whether the Act as then in force empowered the Board to require a mine operator to assume responsibility for post-mining discharge as part of an approved drainage plan upon which a permit is issued, we believe that such right existed in the Board under Section 315(a) and its general rule making power under Section 403 of the Act. This view is consistent with that expressed by the Dauphin County Court prior to the 1965 amendments to the Act in the first *Sunbeam* case, *Sanitary Water Board v. Sunbeam Coal Corp.*, 77 Dauph. 264 (1961), and is not disputed by B & T. This brings us to the third question.

Considering B & T's application for extensions of time under permit No. 564M005 and its application for the 1965 amendments permit and the standard and special provisions imposed by the Board in granting them, did B & T thereby assume responsibility for mine drainage from Mine No. 15 after cessation of mining?

As stated in our findings of fact, we have concluded that B & T in its application for the 1965 amendment permit (No. 567M035) did not intentionally deceive or mislead the Board but made such application consistent with its understanding of the requirements of the regu-

lations and those set forth in Mine Drainage Manual (CX70) issued by the Board. Also, we have found that both B & T and the Board must share equal responsibility for the confusion surrounding issuance of and actions taken under the granting of extensions to permit No. 564M005 and permit No. 567M035 during the critical period in question.

We particularly mention these findings here as illustrative of the inconsistent arguments advanced by the Commonwealth to place responsibility on B & T for the mine drainage in question. Strenuously contending that it was misled and deceived, the essence of one argument of the Commonwealth is that if it had been given the facts it would have imposed post-mining discharge responsibility on B & T under its regulatory powers. This can hardly support another of its contentions that the Board *in fact* did impose such responsibility on B & T under permit No. 567M035.

Nor, in our opinion, did the Board, by regulation then in effect or by any standard or special condition incorporated into extensions of permit No. 564M005 or permit No. 567M035 impose any such responsibility upon B & T.

No such regulation was introduced into evidence. Presumably none existed. The contents of Article 900 of the Board regulations (CX4) and its "guide" captioned "The Mine Drainage Manual of the Board" (CX10) contain only one specific reference to post-mining drainage and both speak to the subject of mine drainage plans and closing procedures showing how a pollutional discharge *will be prevented* after completion of mining. With the exceptions of these references the regulations and manual direct themselves to operating mines, whether newly opened, reopened or continuing in operation. In these documents we cannot find that a permittee lawfully operating a mine

consistent with an approved plan of drainage and sealing it consistent with prescribed closing procedures is also held responsible for post-mining drainage. The thrust of the regulation is towards closing procedures designed to *prevent* post-mining drainage and not to correction of such a condition if it does occur.

An examination of the Standard Conditions Accompanying Permits "Authorizing the Operation of Mines" (CX10) compels the same conclusion. Particular "standard conditions" were incorporated by reference into the extensions of permit No. 564M005 and into permit No. 567M035. None of these incorporated standard conditions, in our opinion, impose responsibility by regulation upon B & T for mine discharge from Mine No. 15 after it was closed.

As noted above with respect to Article 900 of the Regulations and the "Manual," these "standard conditions" speak to and encompass only operating mines, their drainage plans and closing procedures to *prevent* post-mining discharge. We can find not one single provision in any of these documents that clearly or even inferentially imposes any such responsibility upon B & T as a condition of its permits.

Rules and regulations of administrative agencies, lawfully adopted, are subject to the same rules of statutory construction as statutes themselves but obviously cannot be construed to afford a greater power or right in an administrative agency than that imposed by the statute itself. The Commonwealth argues that the legislative intent as manifested in the declaration of policy and legislative findings contained in the 1965 amendments compels a conclusion that the statute itself imposes post-mining discharge responsibility upon a former operator as do the Board's regulations consistent with such expressed legislative intent. Considering the legislative history of clean streams legislation

both prior and subsequent to the 1965 amendments to The Clean Streams Law, there can be no doubt that the Legislature was fully aware of and conversant with the complex problems surrounding mine drainage from closed mines whether they be characterized as having been abandoned or otherwise. It is inconceivable that if in 1965 it intended to place responsibility as argued by the Commonwealth, it would leave the question open to inference.

*Second Issue*

As a separate count in its amended complaint the Commonwealth asserts by reason of the provisions of Section 316 of the Act that B & T is responsible for the mine water discharge emanating from Mine No. 15 as the "landowner" holding title to or having proprietary interests in the land encompassing the mine.

Section 316 was *added* to The Clean Streams Law by the 1965 amendments. As originally added this section merely empowered the Sanitary Water Board to authorize access by mine operators, government personnel and others onto the lands of others who refused such access where conditions on such land resulted in pollution of the waters of the Commonwealth. Essentially, its provisions afforded a new tool to combat pollution.

It was not until the 1970 amendments to Section 316 were enacted (effective July 31, 1970) that the legislature imposed a conditional and limited responsibility upon landowners or occupiers for the correction of conditions which caused or posed a danger of pollution.

Apart from constitutional questions raised by the imposition of such responsibility upon landowners apparently without regard to causation or fault, the Legislature, in continued recognition of the special consideration historically afforded the mine drainage prob-

lem, excepted landowners from the cost of correcting the polluting condition under certain circumstances.

As amended in 1970, Section 316 now provides:

"Whenever the Sanitary Water Board finds that pollution or a danger of pollution is resulting from a condition which exists on land in the Commonwealth the board may order the landowner or occupier to correct the condition in a manner satisfactory to the board or it may order such owner or occupier to allow a mine operator or other person or agency of the Commonwealth access to the land to take such action. For the purpose of this section, 'landowner' includes any person holding title to or having a proprietary interest in either surface or subsurface rights.

"For the purpose of collecting or recovering the expense involved in correcting the condition, the board may assess the amount due in the same manner as civil penalties are assessed under the provisions of section 605 of this act: Provided, however, That if the board finds that the condition causing pollution or a danger of pollution resulted from mining operations conducted prior to January 1, 1966, or, if subsequent to January 1, 1966, under circumstances which did not require a permit from the Sanitary Water Board under the provisions of section 315(b) of this act as it existed under the amendatory act of August 23, 1965 (P. L. 372), then the amount assessed shall be limited to the increase in the value of the property as a result of the correction of the condition."

There is no evidence in this record that the Sanitary Water Board or the Department issued any order at any time against B & T as a "landowner" under the provisions of this section. It is also clear from the record that all operative facts material to the cause of action here asserted by the Commonwealth occurred prior to the effective date of the 1970 amendments on

July 31, 1970. Nonetheless, some eight months after filing its original complaint, the Commonwealth now asserts liability on the part of B & T under this section. Among the contentions advanced by the Commonwealth to overcome the obvious barriers it faces is one to the effect that its order of July 28, 1970 (suspending for the second time permit No. 567M035), was "intended" to be and should be considered to be an order under Section 316. As the 1970 amendments were not then in effect such a contention is not only specious but also illustrative of the total lack of persuasive support for the Commonwealth's position on this legal issue.

The inescapable conclusion is that the Commonwealth could not have intended and had never attempted to employ the power given to it under Section 316 with respect to the mine drainage in question. We need not, therefore, reach the question of whether or not its provisions unqualifiedly and absolutely impose upon a "landowner" responsibility for pollution by mine drainage from his lands and, if so, whether such a provision is constitutional if such responsibility is imposed without regard to causation or fault.

*Third Issue*

Another theory advanced by the Commonwealth in its amended complaint is that under Section 3 of The Clean Streams Law the discharge of acid mine drainage from Mine No. 15 into the waters of the Commonwealth constitutes a statutorily declared public nuisance which B & T has a duty to abate.

As originally enacted Section 3 of the Act provided:

"Discharge of Sewage and Industrial Wastes Not a Natural Use.—The discharge of sewage or industrial waste or any noxious and deleterious substances into the waters of this Commonwealth, which is or may become inimical and injurious to the public health, or to

animal or aquatic life, or to the uses of such waters for domestic or industrial consumption, or for recreation, is hereby declared not to be a reasonable or natural use of such waters, to be against public policy and to be a public nuisance."

Its text remained the same until the 1970 amendments, when it was amended to read:

"Discharge of Sewage and Industrial Wastes Not a Natural Use.—The discharge of sewage or industrial waste or any substance into the waters of this Commonwealth, which causes or contributes to pollution as herein defined or creates a danger of such pollution is hereby declared not to be a reasonable or natural use of such waters, to be against public policy and to be a public nuisance."

The history of The Clean Streams Law and its amendments in 1945, 1965 and 1970, as heretofore set forth, bear upon this issue and will not be repeated here. It should be recalled, however, that a 1965 amendment further defined the term "industrial waste" (Section 1 of the Act) to include "mine drainage" incident to broad amendments to the Act which at the same time gave the Sanitary Water Board regulatory powers over all such discharges and in essence eliminated the distinction between and different treatment accorded mine drainage into "clean" and "unclean" waters of the Commonwealth which theretofore existed.

In resolving this issue we must also consider the provisions of Section 701 of the Act which provides, as it has since 1937:

"Existing Rights and Remedies Preserved.—The collection of any penalty under the provisions of this act shall not be construed as estopping the Commonwealth, or any district attorney or solicitor of a municipality, from proceeding in courts of law or equity to abate pollutions forbidden under this act, or abate nuisances

under existing law. It is hereby declared to be the purpose of this act to provide additional and cumulative remedies to abate the pollution of the waters of this Commonwealth, and nothing in this act contained shall in any way abridge or alter rights of action or remedies now or hereinafter existing in equity, or under the common or statutory law, criminal or civil, nor shall any provision of this act, or the granting of any permit under this act, or any act done by virtue of this act, be construed as estopping the Commonwealth, persons or municipalities, in the exercise of their rights under the common law or decisional law or in equity, from proceeding in courts of law or equity to suppress nuisances, or to abate any pollution now or hereafter existing, or enforce common law or statutory rights."

In advancing this argument the Commonwealth relies upon and asserts to be controlling the case of *Commonwealth ex rel. Shumaker v. New York & Pennsylvania Company, Inc.*, 367 Pa. 40, 79 A. 2d 439 (1951). We cannot agree. On the contrary, if it can be cited as supporting either party in this litigation as to this issue, it could more aptly be cited by B & T.

In *Shumaker*, the polluting subject was industrial waste from a pulp and paper mill operation intentionally discharged into clean waters of the Commonwealth. As the Commonwealth correctly points out, our Supreme Court clearly held that the purpose of Section 701 was to preserve any and all remedies or rights of action that were historically available to abate pollutional discharges that constituted public nuisances, and the Commonwealth was not restricted to remedies otherwise specifically provided by the Act. However, as to statutorily declared nuisances as distinguished from common law nuisances, we cannot agree that the Legislature, at least until 1965, declared the discharge of mine drainage into the waters of the Commonwealth

regardless of their purity to be prohibited and violative of Section 3 of the Act independent of and without regard to all other provisions of the Act. To so declare would be to close one's eyes to the provisions of The Clean Streams Law as originally enacted and as amended in 1945, 1965 and 1970 and would render practically meaningless the original exclusion of mine drainage from its original provisions and the gradual elimination of the exclusion culminating in the amendments of 1970. In *Shumaker*, there was never any question that the discharge there involved was an industrial waste as defined by the Act, that its discharge into the waters of the Commonwealth was absolutely prohibited without exception or qualification and that because the case was decided on pleadings taken to be true, the waters of the Commonwealth there involved were considered to be clean, which is not the case here.

In our opinion, considering the legislative enactments predating The Clean Streams Law, its original provisions and the history of its amendments to the year 1970, the conclusion is inescapable that prior to 1945, mine drainage into the waters of the Commonwealth, clean or otherwise polluted, was not statutorily declared as a public nuisance; that in 1945 it was so declared as to discharge into "clean" waters of the Commonwealth and it was not until 1965 that mine drainage was unequivocally so declared. The Commonwealth has never asserted that the waters of the Commonwealth here involved were clean waters and all the evidence is to the contrary. Hence, as to the operative facts of this case it cannot be concluded that the discharge of acid mine drainage of Mine No. 15 constituted a statutorily declared public nuisance contrary to Sections 3 and 310 of the Act and thereby preserved for enforcement under Section 701 of the Act.

48

*Fourth Issue*

Apart from and independent of any alleged responsibility of B & T under statutory law, the Commonwealth here asserts that the mine drainage discharge from Mine No. 15 after cessation of mining constitutes a common law nuisance for which B & T is responsible as the creator of the harmful condition and as the owner or having proprietary interests in the land and its subsurface.

In approaching this issue it is imperative that there be kept in mind the history of the operation and closure of Mine No. 15 and the statutory law in effect during these periods. Although the authorities cited by each of the parties with respect to this issue are instructive, none were decided within the context of the facts of this case. At best they afford precedent and guidance for general principles of law which bear upon but are not decisive of the issue here raised.

The mine drainage discharge which the Commonwealth contends to be the nuisance to be abated (in entering the waters of the Commonwealth) is post-mining discharge after cessation of mining which occurred as a natural result of the previous mining operations coupled with the volume and flow of surface and subsurface waters in the Barnesboro Basin.

The physical characteristics of Mine No. 15 after cessation of mining and its sealing might aptly be described as an artificial condition of the subsurface of the land created by the conduct of B & T and its predecessors. Its location at the lowest subsurface elevation of the Barnesboro Basin, however, is a natural phenomena, as is the gross volume of surface and subsurface water which by reason of percolation and subsurface flow finds its way into Mine No. 15 by the force of gravity. Although sharply disputed by the experts for the respective parties as to the source of the total

volume of subsurface water "generated" in Mine No. 15—some of it said to be "fugitive" water from surrounding mines of higher subsurface elevation—the fact remains that this artificially created subsurface condition because of its location produced a receptacle for underground water—whatever its source—which receptacle, again because of the forces of nature, overflowed. In doing so, it breached the land surface and entered the waters of the Commonwealth.

Under these circumstances, can it be said that a common law nuisance exists for which B & T is wholly or partially responsible either as the creator of a harmful condition or as the owner or possessor of the land on which the condition exists?

The futility of attempting—and perhaps the wisdom of not attempting—to define a public nuisance at common law and its operative elements to which proven facts in any given case can be applied is evident in the decisional law of Pennsylvania on the subject. A careful analysis of many cases discloses no such definition but only a montage of particular elements apparently considered to be controlling and from which it was concluded that a public nuisance did indeed exist.

The distinction between a public nuisance and a private nuisance, as such, poses no particular problem. The former is one that offends the public at large or a segment of that public while the latter offends only a particular person or persons. A distinction drawn between nuisances in fact and nuisances per se is also found in many cases both with respect to private and public nuisances; a nuisance per se being something which is generally recognized as injurious to health or welfare of the community so that proof of the nuisance may be made simply by proof of the act. *Hostetter v. Sterner's Grocery, Inc.,* 390 Pa. 170, 134 A. 2d 884 (1957). But such a definition of a nuisance per se is

overbroad and simplistic, as its application in already decided cases would surely have produced a result contrary to that actually reached.

The decisional law of Pennsylvania within the limited subject of the pollution of streams by mining operations affords some guidance in determination of the issue under consideration, but in our opinion falls far short of controlling its outcome.

In *Pennsylvania Coal Company v. Sanderson*, 113 Pa. 126, 6 A. 453 (1886), an early landmark case of *private* nuisance, it was held that, in the operation of mining in the ordinary and usual manner, the operator of the mine may, upon his own lands lead the water which percolates into his mine into the streams which form the natural drainage of the basin although the quantity as well as the quality of the water in the stream may thereby be affected, without liability to lower riparian owners for increased quantity or for rendering the water unfit for domestic and other purposes. The court said:

"The right to mine coal is not a nuisance in itself. It is, as we have said, a right incident to the ownership of coal property, and when exercised in the ordinary manner, and with due care the owner cannot be held for permitting the natural flow of mine water over his own land, into the water course, by means of which the natural drainage of the country is effected.

"There are, it is well known, percolations of mine water into all mines; whether the mine be operated by tunnel, slope or shaft, water will accumulate, and, unless it can be discharged, mining must cease. The discharge of this acidulated water is practically a condition upon which the ordinary use and enjoyment of coal lands depends; the discharge of the water is therefore part and parcel of the process of mining, and as it can only be effected through natural channels, the

denial of this right must inevitably produce results of a most serious character to this, the leading industrial interest of the state.

"The defendants were engaged in a perfectly lawful business, in which they had made large expenditures, and in which the interests of the entire community were concerned; they were at liberty to carry on that business in the ordinary way, and were not, while so doing, accountable for consequences which they could not control; as the mining operations went on, the water by the mere force of gravity ran out of the drifts and found its way over the defendant's own land to the Meadow Brook. It is clear that for the consequences of this flow, which by the mere force of gravity, naturally, and without any fault of the defendants, carried the water into the brook and thence to the plaintiff's pond, there could be no responsibility as damages on the part of the defendants." 113 Pa. at 146-47, 6 A. at 457.

While subsequent decisions have declared that *Sanderson* must be strictly limited to its facts,[3] it has never been overruled. The most salient of its facts were that the stream in question was *already polluted* and that the mine water *flowed naturally* from the mine.

In *McCune v. Pittsburgh and Baltimore Coal Company*, 238 Pa. 83, 85 A. 1102 (1913), also a private nuisance case, it appeared that mine water was accumulated at the bottom of a bore hole, pumped to the surface and thence discharged into a stream of clean water running through plaintiff's property making the stream water unfit for domestic or farm use. The Supreme Court affirmed per curiam on the opinion of the lower court which said:

---

[3] *See Getting v. Union Improvement Co.*, 7 Kulp 493 (1895), and *Williams v. Union Improvement Co.*, 6 Kulp 417 (1892).

"If the doctrine of the Sanderson case is not to be extended, as we are admonished by the Supreme Court, it is clear that we have no right to give it application here. The cases are unlike in nearly every essential particular. If the remedy sought be denied, this court must go far beyond the Sanderson case and hold that a mine owner can divert the natural flow of the water in the mine, raise it artificially to the surface and thereby destroy a pure stream of water on higher ground. The principle involved is of far reaching consequence. The exception introduced in the Sanderson case has resulted in the pollution of nearly every stream in the western end of the State and it has become a serious problem how to obtain pure water sufficient to supply the inhabitants.

". . . A prima facie case would have been made out for plaintiff by showing that a stream of pure water flowing through his land was polluted by the action of defendant in pumping mine water from a lower level. Under such circumstances an action would lie under the maxim sic utere. The burden then undoubtedly would be on defendant to show that the natural use of his property made such injury unavoidable. . . .

"The defendant has failed to establish that the injury was unavoidable or to prevent it would necessitate such expense as would deprive it of the use of its property. There was no attempt to show that an opening which would afford natural drainage for the mine water was impracticable, and the evidence fails to show that the water . . . can not be discharged otherwise than to the injury of plaintiff. 'The extreme exception to the general rule' which was introduced in the Sanderson case does not control because, as already pointed out, the conditions as presented in the two cases are unlike. The undoubted tendency of later cases is to limit rather than extend the principle of that case. It

follows, therefore, that the general rule must apply, and that the defendant must use its own property so as to avoid injury to the plaintiff." 238 Pa. at 93-95, 85 A. at 1106. *Also see Roaring Creek Water Company v. Anthracite Coal Company of Pittsburg*, 212 Pa. 115, 61 A. 811 (1905), a brief per curiam opinion sustaining the grant of a preliminary injunction in which it was shown that defendants were pumping impure water accumulated in its mine into a pure stream whereby the stream water became polluted when for "a trifling expense the mine water could be discharged into another water course where it would injure no one."

The salient facts of these cases, which appear to have impelled a result contrary to *Sanderson* were the purity of the stream into which mine water was discharged, the affirmative act of pumping the mine water and the balancing of the cost of alternative methods of disposal against the deleterious impact upon plaintiffs and the use of their land.

In *Pennsylvania R. R. v. Sagamore Coal Co.*, 281 Pa. 233, 126 A. 386 (1924), the Supreme Court was again faced with its decision in *Sanderson;* this time on an appeal from dismissal of a complaint in equity by the lower court in which it was charged that a *public* water supply from a *pure stream* was being polluted by acid mine water drainage into the stream from an operating mine. It is not clear whether the mine discharge was pumped into the stream or naturally flowed into it. In reversing the lower court, the Supreme Court said the case was controlled by one fact and a single equitable principle, ". . . the fact that the stream has been polluted, and the principle that this creates an enjoinable nuisance, if the public uses the water." It said this in the context of a "stream of pure water (one of the very few unpolluted ones in the section of the State where it is located) . . . impounded, primari-

ly, for the purpose of furnishing uncontaminated water. . . ." It further stated:

"We have, therefore, a situation where the waters of a stream are devoted to public use. Does the Sanderson Case apply under these circumstances? That litigation did not involve the rights of the public to the waters of streams in any sense. What was affected by the pollution of the stream was the private concern of that plaintiff. The case was determined on the balancing of the 'necessities of a great public industry' and a 'mere personal inconvenience.'

. . .

"It could not be said that a landowner on a watercourse whose rights in the stream are only those of a riparian proprietor (and none other is shown in defendants), would have them enlarged to one of property in the use of the waters by the discovery or development of coal on his lands.

"Our conclusion is that defendants have no right of any kind to drain their mine waters into the stream considering the public use which is made of its waters and that their so doing constitutes a nuisance which must be restrained.

"We recognize, however, as evidently the court below also did, that the public has an indirect interest in the business of defendants, and hence, applying the principle that he who seeks equity must do equity, the decrees to be entered should require plaintiffs (other than the Commonwealth), so far as this can reasonably and legally be done, to afford defendants an opportunity to transport and dispose of the mine water of their respective mines in such a way as shall minimize the expense of so doing; and the decrees, after their entry, should be enforced in the same equitable spirit. In fairness to plaintiffs it should be stated that their counsel, in oral argument at the bar of the court, ex-

pressed the willingness of their clients to thus cooperate with defendants.

"The decrees of the court below dismissing plaintiffs' several bills of complaint are reversed, the bills are reinstated, and it is directed that the court below shall enter decrees, enjoining and restraining defendants, and each of them, from discharging, pumping or causing or permitting to flow or to be discharged, any drainage of mine water from their mines, and from the mines of each of them, into the waters of Indian Creek, or its tributaries, above the dam of the Mountain Water Supply Company, after the expiration of six months from the date of the entry of the decrees." 281 Pa. at 246-47, 250-51, 126 A. at 390, 392.

The salient facts of this case were the purity of the stream in question and its use as a supply of water for domestic consumption by a large segment of the public. Apparently it was not considered as important or controlling, that the mine drainage may have flowed naturally into the stream.

Although not concerned with mine drainage from an operating mine or from a closed mine, the Commonwealth, as to this issue, also relies upon the case of *Commonwealth ex rel. Shumaker v. New York & Pennsylvania Company, Inc., supra,* discussed at some length under the Third Issue, *supra.* As to this issue, the Commonwealth asserts the case stands for the unqualified principle that corruption of the waterways when it affects the public use of a stream or menaces the public health, becomes a public nuisance which the Commonwealth may seek to abate in equity. In *Shumaker* the Court said:

"Corruption of water, when it affects the public use of a stream or menaces the public health, becomes a public nuisance which the commonwealth may suppress by criminal proceedings upon indictment for maintain-

ing a public nuisance and upon conviction the court may in its sentence include an order requiring abatement of the nuisance: see Barclay v. Commonwealth, 25 Pa. 503 (1855). Also the Commonwealth may proceed in equity for an injunction requiring abatement of the nuisance: Pennsylvania R. R. et al. v. Sagamore Coal Co., 281 Pa. 233, 126 A. 386 (1924); Com. ex rel. v. Soboleski, 303 Pa. 53, 153 A. 898 (1931); Com. v. Kennedy, 240 Pa. 214, 87 A. 605 (1913); Com. ex rel. v. Emmers, 221 Pa. 298, 70 A. 762 (1908). When the Commonwealth so proceeds its right to relief is not restricted by any balancing of equities, nor by the rule of 'damnum absque injuria' as in Pa. Coal Co. v. Sanderson, 113 Pa. 126, 6 A. 453 (1886), nor by any question of possible prescriptive rights for no matter how long continued stream polluters can acquire no prescriptive or property right to pollute as against the Commonwealth: Pennsylvania R. R. Co. et al. v. Sagamore Coal Co., supra.

"It was upon this law, so established, that section 3 of Article I of the Pure Streams Act above quoted, was based. The legislature therefore stood on solid ground in declaring its public policy and what discharges were to be considered as public nuisances in contradistinction to private nuisances, not merely for the purposes of that Act, but generally. In Commonwealth v. Dietz, 285 Pa. 511, 519, 132 A. 572 (1926), we said, 'When the legislature validly pronounces a particular state of affairs to be a nuisance prejudicial to the public health, it is as much so as if the proscribed situation had been considered a "nuisance . . . at common law," and "may be prohibited by the same remedies." ' To this we may well add it is so, *a fortiori,* where the proscribed conditions were already recognized as a nuisance at common law." 367 Pa. at 48-9, 79 A. 2d at 444.

As previously noted, however, this statement was made in the context of the discharge of industrial wastes—as then defined by the statute—into a pure stream by the operator of a pulp and paper mill and at a time in the legislative history of The Clean Streams Law which excluded mine drainage from not only regulatory control but from the definition of industrial waste. Our analysis of this case as it pertains to common law public nuisance is simply that if a nuisance at common law can be found to exist, Sections 3 and 701 of the Act considered together preserve the right in the Commonwealth to abate it through equity.

In our opinion, the decisions that we have here reviewed and their supporting authority justify our view that the present case is one of first impression as to whether it can be judicially declared today under the facts of this case that a public nuisance at common law exists for which B & T has sole or partial responsibility for its abatement.

Of the one or more common facts found in the reviewed cases leading the court to conclude that a common law public or private nuisance existed as a matter of law, none are present in the instant case. The waters of the Commonwealth here in question are and for a long period of time have been polluted by sewage and acid mine drainage from closed or "abandoned" mines. Except for some developing recreational uses there is no evidence that these waters in their polluted state are used for public purposes. Nor do we have in this case facts supporting concepts of negligence, foreseeability or unlawful conduct, being elements of seemingly persuasive force in some of the cases. Similarly, factors of a present activity on the part of the owner or user of the land or of a course of conduct directly producing the deleterious result are absent in this case.

What we do have is an artificial condition of the subsurface of the land as a result of the mining activity of B & T and its predecessors who at all times conducted their mining operations and the ultimate closure of the mine in a lawful manner and consistent with statutory law and regulations then in effect. We further have the forces of nature at work which forces— given the location of the closed mine and the volume of water entering it by percolation and subterranean flow —produced a breakout which resulted in further pollution of a polluted stream from the acid mine drainage forced out of the mine.

For better than one hundred years the State has chosen to regulate mining and there is no credible evidence in this case that Mine No. 15 was not operated and eventually closed consistent with statutory law, regulation or licenses issued pursuant thereto. With respect to clean stream legislation, until 1945 the Legislature accorded exemption to mine drainage from operating mines from declaration of unlawfulness or regulatory control into the waters of the Commonwealth, clean or otherwise polluted; and it was not until 1965 that it chose to exercise regulatory control over such drainage as to all waters of the Commonwealth and declare violation to be a statutory nuisance. And it was not until 1970 that it clearly empowered the government to place responsibility for post-mining drainage upon an operator. During this period, as disclosed in the legislative history, *supra,* the Legislature recognized and placed upon the government responsibility for abatement of mine drainage discharge from "abandoned" mines and provided funds for such abatement however adequate or inadequate to the task such funds might be.

Considering the legislative history, the lawful operation and closure of Mine No. 15 at all times and the

other salient facts of this case, we cannot today declare—solely for the reason that B & T and its predecessors created a subsurface artificial condition by reason of mining—that a breakout of mine water through the forces of nature at work adjunctive to said artificial condition, constitutes a public nuisance for which B & T is responsible today. The Commonwealth, through the Legislature, has recognized that the pollution or further pollution of the waters of the Commonwealth by mine drainage is deleterious to the health and welfare of the citizens of Pennsylvania. As to the future it has empowered the government to place responsibility upon operators for post-mining discharge. As to the past, it has declared that the government shall be responsible for such discharge for closed or abandoned mines.

Accordingly, we conclude under the facts of this case that B & T cannot be held responsible for abatement of the discharge from closed Mine No. 15 on the theory of common law public nuisance.

For the foregoing reasons we make the following

### Conclusions of Law

1. Barnes & Tucker Company, as the holder of time extended permit No. 564M5 or as the holder of permit No. 567M035 did not assume responsibility by reason of the provisions of The Clean Streams Law or regulation promulgated thereunder then in effect for mine water discharge from Mine No. 15 after cessation of mining.

2. The mine water discharge emanating from Mine No. 15 after cessation of mining did not become the responsibility of Barnes & Tucker Company to abate its polluting qualities under Section 316 of The Clean Streams Law as then in effect, as the owner or as one having proprietary interests in said mine.

3. The mine water discharge emanating from Mine No. 15 after cessation of mining does not constitute a public nuisance under Section 3 of The Clean Streams Law as then in effect for which Barnes & Tucker Company is presently responsible and which it must abate of its polluting qualities.

4. The mine water discharge emanating from Mine No. 15 after cessation of mining does not constitute a common law nuisance for which Barnes & Tucker Company is responsible and which it must abate of its polluting qualities.

### DECREE NISI

Now, April 16, 1973, in recognition of the need for further proceedings to fix money damages to be awarded on any judgment to be entered consistent with the foregoing opinion and this decree nisi; of the need for and public interest in continuation of the preliminary injunction heretofore issued by order dated April 13, 1971, pending final disposition of this case; and of the likelihood of appeal because of the important and novel legal issues involved, it is hereby ORDERED as follows:

1. If within thirty (30) days of the date hereof no exceptions are filed by either party to rulings on objections to evidence, to findings of fact or conclusions of law, or to refusals to find requested findings of fact or conclusions of law, the hearing judge shall promptly conduct a hearing to determine the amount of money damages to be awarded to Barnes & Tucker Company consistent with prior order of Court dated April 13, 1971, to be followed by further order of Court directing entry of judgment which will dissolve the preliminary injunction heretofore issued; said preliminary injunction to remain in full force and effect until such further order of Court.

2. If within said thirty (30) days exceptions as aforesaid are filed by either party, said preliminary injunction shall remain in full force and effect until such exceptions are ruled upon by the Court and thereafter until further proceedings as aforesaid are conducted by the hearing judge, if necessary, and further order of Court entering a final judgment perfecting right of appeal in the party against which judgment is entered.*

CONCURRING OPINION BY JUDGE MENCER:

I concur in the result reached because, in the words of President Judge BOWMAN, "factors of a present activity on the part of the owner or user of the land or of a course of conduct directly producing the deleterious result are absent in this case." The absence of these factors is the distinguishing factual feature between this case and the cases of *Pittsburgh Coal Company v. Sanitary Water Board*, 4 Pa. Commonwealth Ct. 407, 286 A. 2d 459 (1972), and *Harmar Coal Co. v. Sanitary Water Board*, 4 Pa. Commonwealth Ct. 435, 285 A. 2d 898 (1972). My dissenting opinions in those two cases contended that there were violations of the 1965 amendments to The Clean Streams Law, enacted by the Act of August 23, 1965, P. L. 372, because there was a discharge into the streams as a result of present

---

* The foregoing opinion was prepared before and was being processed to be the decision of the Court in this case at the time the Supreme Court of Pennsylvania handed down its opinion in *Commonwealth v. Harmar Coal Company* (No. 89 May Term 1972) and *Commonwealth v. Pittsburgh Coal Company* (No. 90 May Term 1972) reversing this Court in those cases. We have carefully reviewed the opinion of the Supreme Court in those cases and, while certain observations and discussion contained therein might ideally suggest some revision of discussion contained in the above opinion, we are of the opinion that the decision in those cases is not controlling of this case. To avoid further delay we, therefore, hand down our opinion in this case without revision.

activity on the part of the owner or user of the land or a course of conduct (pumping) directly producing the discharge and deleterious results.

I am of the opinion that the 1970 amendments to Section 316 of The Clean Streams Law, Act of July 31, 1970, P. L. 653, §12, 35 P.S. §691.316, could have been applied in this case but fully agree with the opinion writer that "[t]here is no evidence in this record that the Sanitary Water Board or the Department issued any order at any time against B & T as a 'landowner' under the provisions of this section."

Finally, the confusion as to whether, during the critical periods of time in this case, B & T was operating under permit No. 567M035 or extensions of permit No. 564M005, coupled with the cessation of all operations and the closing of Mine No. 15 by late July 1969, nearly one year prior to the first breakout, leads me to believe that the result here is legally correct.