371 A.2d 461

**COMMONWEALTH of Pennsylvania**

v.

**BARNES & TUCKER COMPANY,**
**Appellant.**

Supreme Court of Pennsylvania.

Argued Nov. 15, 1976.

Decided Feb. 28, 1977.

Rehearing Denied April 6, 1977.

116

Eckert, Seamans, Cherin & Mellott, Cloyd R. Mellott, C. Arthur Wilson, Jr., John R. Kenrick, Pittsburgh, Rhoads, Sinon & Reader, Frank A. Sinon, Harrisburg, Schnader, Harrison, Segal & Lewis, James D. Crawford, Philadelphia, for appellant.

K. W. James Rochow, Harrisburg, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY and NIX, JJ.

## OPINION OF THE COURT

JONES, Chief Justice.

Appellant, Barnes & Tucker Company, appeals from the decree of the Commonwealth Court requiring it to operate the Duman Dam pumping facility for the purpose of preventing the discharge of untreated acid mine water at its Mine No. 15, located in an area of Cambria and Indiana Counties, Pennsylvania known as the Barnesboro Basin. This case was previously before this Court on appeal for the purpose of determining the "power of the Department of Environmental Resources to enjoin acid mine drainage from abandoned mines." [1]

In that appeal, we found:

"The third and fourth bases upon which the Commonwealth claims relief should be granted are the doc-

---

1. *Commonwealth v. Barnes & Tucker Co.*, 455 Pa. 392, 319 A.2d 871 (1974) (hereinafter Barnes & Tucker I).

trines of statutory and common law public nuisances. We find that relief may be granted under *either* of these theories." 455 Pa. at 408, 319 A.2d at 880.

We went on in our opinion to hold that:

"From our prior discussion it is clear that the public interest requires the interposition of the Commonwealth's authority in this case. Furthermore, since the activity involved is a public nuisance it cannot be regulated, but must be abated. We believe that abatement of water pollution is unquestionably a reasonable exercise of the police power in the abstract. We are not swayed in this belief by the fact that the mining activity which gave rise to the present condition is past conduct which obviously cannot now be abated." 455 Pa. at 418–19, 319 A.2d at 885.

However, due to an inadequate record, we remanded to the Commonwealth Court to fashion an appropriate decree:

"The precise nature of relief which would be warranted and reasonable in this case must rest with the chancellor who may need to take additional testimony and make additional findings of fact in so determining." 455 Pa. at 419, 319 A.2d 886.

Since we previously determined that the condition existing at Mine No. 15 is a public nuisance, the issue [2] in this appeal narrows to a two-pronged inquiry: (a) whether the means adopted by the Commonwealth Court are reasonably necessary for the abatement of the nuisance; (b) whether it would be unduly oppressive to require Barnes & Tucker to abide by the order of the Commonwealth Court.

2. Although appellant has briefed numerous other points on this appeal, these additional issues raised by appellant are not relevant to our determination of this matter since they were disposed of in our prior consideration of this case.

## I

A brief review of the events preceding this appeal and the nature of the discharge of acid mine water at Mine No. 15 will be helpful in the consideration of this appeal.[3] Mine No. 15 is a deep bituminous coal mine located in the B seam of coal in the Barnesboro Basin area of Cambria and Indiana Counties near the headwaters of the West Branch of the Susquehanna River. Most of the area of Mine No. 15 is located in the lowest portion of the Barnesboro Basin. It contains approximately 6,600 acres.

The mine was originally opened in 1915 in the northeast section of the Barnesboro Basin near where the coal outcrops in the vicinity of the West Branch of the Susquehanna. From 1915 until 1969, when the mine was closed, mining operations were conducted along the dip of the coal seam in Mine No. 15, i. e., from the highest elevation of the coal seam at the outcrop near the West Branch in the southwesterly direction to the lowest area of elevation of the coal seam. Barnes & Tucker ceased its mining operations of Mine No. 15 on May 10, 1969, and subsequently sealed the mine openings and completed construction of barriers between the No. 15 mine and the adjacent Mine No. 24–B.[4]

In late June 1970, a substantial discharge of acid mine water drainage into the West Branch of the Susquehanna River from the Buckwheat borehole of Mine No. 15, lo-

3. For a more detailed account of the history of Mine No. 15 and the permits under which it has operated prior to the inception of this action, see Commonwealth v. Barnes & Tucker Co., 9 Pa. Cmwlth. 1, 303 A.2d 544 (1973).

4. The construction of the bulkheads between Mine No. 24–B and Mine No. 15 and the sealing of Mine No. 15 by Barnes & Tucker were completed in accordance with the requirements of the Department of Mines and Mineral Industries of the Commonwealth in effect at the time the construction and sealing were done. See Commonwealth v. Barnes & Tucker Co., 9 Pa.Cmwlth. 1, 7, 303 A.2d 544 (1973).

cated at the northeast end of the mine, was discovered. This discharge prompted the Sanitary Water Board [5] to issue an order (dated July 7, 1970) suspending Barnes & Tucker's permit No. 567MO35.[6] This suspension was to remain in effect until (1) the Buckwheat borehole was plugged, (2) satisfactory treatment facilities were placed in operation and (3) satisfactory plans for prevention of pollution after cessation of mining had been submitted. A subsequent Board order (dated July 16, 1970) reinstated permit No. 567MO35 subject to special conditions.

Prior to the reinstatement order of July 16, 1970, the Buckwheat borehole had been plugged, but the pool level in Mine No. 15 was rising to a level which threatened a discharge from a portal in the general vicinity of the Buckwheat borehole now plugged. Barnes & Tucker then proposed to construct relief boreholes and build treatment facilities in that area for the liming of any discharge. This second borehole (Mayberry) was constructed and treatment of its discharge began, but on July 23, 1970, another substantial acid mine water discharge from Mine No. 15 occurred in the vicinity just south of the plugged Buckwheat borehole, which became known as the breakout area.[7] This second discharge re-

5. Prior to the Act of December 3, 1970, P.L. 834, § 30, 71 P.S. § 510–103, the Sanitary Water Board was responsible for mine drainage. By that Act, however, the Sanitary Water Board was abolished and its functions were assumed by the Department of Environmental Resources.

6. · Permit No. 567M035 was the mine drainage permit issued after the effective date of the 1965 amendments to The Clean Streams Law, Act of August 23, 1965, P.L. 372, covering both Mines Nos. 15 and 24.

7. *Commonwealth v. Barnes & Tucker Co.*, 9 Pa.Cmwlth. at 20–21 n. 2, 303 A.2d at 553:
   "The quality and quantity of mine water discharge from Mine No. 15 at these two points was sharply disputed. It is not necessary to resolve this dispute, however, as the evidence clearly discloses the quantity to be substantial, exceeding a million gallons per day. Its acidity level was in excess of minimum water quality standards as clearly recognized by both parties in providing for and undertaking to treat the discharge with a liming process to reduce its acidity."

sulted in another order by the Sanitary Water Board (dated July 28, 1970) which again suspended permit No. 567MO35. Barnes & Tucker then ceased treatment of the discharge at Mayberry, the responsibility of which the Commonwealth assumed on August 22, 1970. In the meantime, Barnes & Tucker appealed to the Commonwealth Court from the Board order of July 28, 1970, and the Commonwealth initiated its complaint in equity seeking preliminary and permanent injunctive relief. The Commonwealth's prayer for relief sought to enjoin Barnes & Tucker from operating Mine Nos. 15, 24–B and 24–D, and to require Barnes & Tucker to take immediate steps to treat the acid mine water drainage to attain specified water quality standards.

The Commonwealth and Barnes & Tucker then entered into a stipulation, accepted by the Commonwealth Court, whereby the Commonwealth would continue its liming treatment of the discharge from No. 15 into the West Branch until Barnes & Tucker, pursuant to the stipulation, constructed and commenced operation of the Duman Dam pumping and treatment facility at the southwest end of the mine from which the treated discharge would flow into the headwaters of the Allegheny River watershed. Barnes & Tucker constructed a treatment facility at Duman Dam and commenced the operation of that facility on November 1, 1970. On February 22, 1971, Barnes & Tucker ceased operating the Duman Dam facility and its operation was assumed by the Commonwealth. On April 13, 1971, the Commonwealth Court issued a preliminary injunction providing for the continued operation of the Duman Dam facility, pending the final determination of the case upon its merits, with the parties sharing the costs of such operation on an equal basis.

Upon remand from this Court, the Commonwealth Court made additional findings of fact and entered a final decree, which reads in pertinent part:

"2. For the purpose of avoiding repetition of such a breakout or the discharge of untreated acid mine wa-

ter from Mine No. 15 into the waters of the Commonwealth, a public nuisance; and until such time as the likelihood of a reoccurrence of another breakout is past, Barnes & Tucker Company shall cause to be pumped from Mine No. 15 sufficient quantities of mine water to avoid any such breakout and shall maintain a treatment program of the mine water discharge to achieve minimum water quality standards as prescribed by law pertaining to the discharge of acid mine water into the waters of the Commonwealth.

3. Expenses incurred by the Commonwealth in the operation and maintenance of the Duman Dam pumping and treatment facility or sums paid by the Commonwealth to Barnes & Tucker incident to the operation of said pumping and treatment facility by Barnes & Tucker during the course of this litigation as prescribed in our prior Orders of April 13, 1971, June 7, 1973 and September 20, 1974, shall be entered as a money judgment in favor of the Commonwealth and against Barnes & Tucker Company."

It is from this decree that Barnes & Tucker now appeals.

## II

In light of the above background, we now move to consider the issue on this appeal concerning the constitutionality of the remedy imposed by the Commonwealth Court. Appellant argues that, since the requirements of The Clean Streams Law already have forced it for economic considerations to cease operation of Mine No. 15, to further compel it to take affirmative steps to treat the acid mine drainage emanating from its now abandoned mine is both an unreasonable exercise of the state's police power and a "taking" of private property in violation of the Fourteenth Amendment to the United States Constitution. We are not persuaded by appellant's arguments and, therefore, affirm the order of the Commonwealth Court.

██ The police power is the inherent power of a body politic to enact and enforce laws for the promotion of the general welfare. "It has long been recognized that property rights are not absolute and that persons hold their property 'subject to valid police regulation, made, and to be made, for the health and comfort of the people. . . .'" *De Paul v. Kauffman*, 441 Pa. 386, 393, 272 A.2d 500, 504 (1971), quoting *Nolan v. Jones*, 263 Pa. 124, 131, 106 A. 235, 237 (1919). It must be recognized that one who challenges the constitutionality of the exercise of the state's police power, affecting a property interest, must overcome a heavy burden of proof to sustain that challenge. *See, e. g., Goldblatt v. Town of Hempstead*, 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed. 2d 130 (1962); *Miller v. Schoene*, 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (1928); *Hadacheck v. Los Angeles*, 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915); *Philadelphia v. Watt*, 162 Pa.Super. 433, 57 A.2d 591 (1948).

As we acknowledged in our previous consideration of this case, the classic rule of *Lawton v. Steele*, 152 U.S. 133, 137, 14 S.Ct. 499, 501, 38 L.Ed. 385 (1894), is instructive in determining whether there has been an unconstitutional exercise of the state's police power:

> "To justify the State in . . . interposing its authority in behalf of the public, it must appear, first, that the interests of the public generally, as distinguished from those of a particular class, require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals. *The legislature may not*, under the guise of protecting the public interests, *arbitrarily interfere with private business or impose unusual and unnecessary restrictions upon lawful occupations.*" (Emphasis added).

██ One of the primary factors which appellant urges should sway this Court to accept its argument is

that much (perhaps the greater proportion) of the acid mine water which is being discharged by Mine No. 15 is attributable to fugitive mine [8] water, generated in other mines in the complex. It is true that the court below found, and the record supports, that of the 7.2 million gallons per day which must be pumped from Mine No. 15 in order to avoid a breakout of acid mine drainage, 6 million gallons are attributable to fugitive mine water. Yet, appellant fails to perceive the true nature of the injury at which the Commonwealth Court's order is directed. The objective of The Clean Streams Law, as amended, is to prevent the further discharge of pollution into the waters of the Commonwealth and not simply the cessation of future activities which are responsible for the creation of the polluting condition. Act of August 23, 1965, P.L. 372, Section 4. The deleterious condition of our waterways attributable to acid mine drainage,[9]

8. " 'Fugitive mine water' is a phrase used to identify mine water entering a particular mine by gravity or pressure and adjoining subsurface mines. . . . [T]he volume of mine water entering or contained in a particular mine is the combined volume of generated and fugitive mine water." *Commonwealth v. Barnes & Tucker Co.*, 23 Pa.Cmwlth. 496, 353 A.2d 471, 475 (1976).

9. Acid mine drainage is primarily the result of acid and iron pollutants formed when the pyrite and marcasite (iron desulfides) present in coalbeds are exposed to the atmosphere and water. When coal is extracted, the pyrites in the mine are exposed to air and water. A chemical reaction occurs and the pyrite is oxidized to form ferrous sulfate and sulfuric acid. The ferrous sulfate and sulfuric acid thus formed are washed off the coal mine walls into the ground water flowing through the mine, where further hydrolizing or oxidizing occurs and ferric iron and additional acids are formed. The ferrous sulfate is then hydrolized forming ferrous iron. Next the ferrous iron is oxidized to the ferric state and additional acidity results.

The end result is that the receiving streams are loaded with sulfates, acid and iron hydroxides, as well as such dissolved minerals as aluminum, calcium, magnesium, manganese and ferrous iron. The iron hydroxides (ferrous and ferric) impart the red color which is characteristic of acid mine drainage. The most frequently observed by-product of acid mine water run-off is "yellow boy", a slightly soluble iron hydroxide which precipitates out into the streambeds. Broughton, Koza, & Selway, *Acid Mine*

which is being discharged from abandoned underground mines,[10] has reached a critical state. *Id.*

"More than 3.5 million tons of acid mine water are discharged annually into the nation's streams and rivers. The estimated annual damage from acid mine drainage in the Appalachian region is nearly ten million dollars, including loss of aquatic life, increased water treatment costs for industries and municipalities, corrosion of barges, boats, bridge piers, dams and other structures, and diminished recreational value of affected rivers and streams. Of the 5,700 miles of streams in Appalachia continuously or intermittently affected by acid mine drainage, three-fourth are found in the Susquehanna, Allegheny, Potomac and Delaware River basins in Pennsylvania, northern West Virginia and Maryland." [11]

*Drainage and the Pennsylvania Courts,* 11 Duq.L.Rev. 495, 496–97 (1973) [hereinafter cited as *Acid Mine Drainage*].
    "Acid drainage affects the surrounding environment by reducing the pH of both soil and streams to an extent that it is not conducive to most vegetable growth. For example, if the pH of a stream is reduced below 5.0, the stream is incapable of supporting fish. This type of pollution is responsible for a major share of the economic damage resulting from coal mine water pollution." Begley & Williams, *Coal Mine Water Pollution: Acid Problem with Murky Solutions,* 64 Ky.L.J. 507, 511 (1975–76).

10. "Underground mines produce 71.3% of all mine acid drainage, although they constitute only 58% of the number of individual sources. Inactive underground mines, constituting 53% of the sources, contribute 52.5% of the total acid mine drainage. Active underground mines on the other hand, contribute 18.8% of total acid mine drainage, although they constitute only 5% of the total sources. Thus not only is the acid mine drainage problem concentrated geographically, it is also concentrated in one segment of the mining industry." *Acid Mine Drainage, supra* at 498–99, citing Appalachian Regional Commission, Acid Mine Drainage in Appalachia (1969). One study has estimated that approximately seventy-eight per cent of all acid mine drainage in Appalachia has been estimated to flow from abandoned or inactive mines. Comment, *Environmental Law—Acid Mine Drainage,* 76 W.Va.L. Rev. 508, 520 (1973–74), citing Bituminous Coal Research Inc., Studies on Limestone Treatment.

11. Comment, *Environmental Law—Acid Mine Drainage,* 76 W.Va. L.Rev. 508 (1973–74), citing Environmental Protection Agency,

Here, as we acknowledged in *Barnes & Tucker I,* the condition created by appellant's past mining operations constitutes a public nuisance which requires abatement. *Commonwealth v. Barnes & Tucker Co.,* 455 Pa. 392, 319 A.2d 871 (1974). It is not the source of the polluted water itself, but the *source of the discharge* of the acid mine water into the waters of the Commonwealth with which we are presently concerned. *See, e. g., Commonwealth v. Harmar Coal Co.* and *Commonwealth v. Pittsburgh Coal Co.,* 452 Pa. 77, 306 A.2d 308 (1973).[12] As the Commonwealth Court recognized:

> "Whether the impelling force which produced the public nuisance is solely or partially that of fugitive mine water flowing into and adding to the generated water of that mine, *the conduct of Barnes & Tucker in its mining activity remains the dominant and relevant fact without which the public nuisance would not have resulted where and under the circumstances it did."* 23 Pa.Cmwlth. at 510, 353 A.2d at 479. (Emphasis added).

Nor, does the fact that the present condition arises only from past activities affect the appropriateness of invoking the police power to dispel the immediate dangerous condition. *See, e. g., Usery v. Turner Elkhorn Mining Co. et al.,* 428 U.S. 1, 96 S.Ct. 2882, 49 L. Ed.2d 752 (1976); *Commonwealth ex rel. Chidsey v.*

Evaluation of Waste Waters from Petroleum and Coal Processing 119 (1972); Appalachian Regional Commission, Acid Mine Drainage in Appalachia, H.R.Doc. No. 180, 91st Sess. 24 (1969).

12. In *Harmar,* we found that:
   "As to the definition of 'mine drainage,' we define it as waters which have been polluted as a result of the operation of a mine. The Commonwealth Court, however, was of the opinion that the fugitive water in this case was no longer mine drainage but rather 'the natural flow of "waters of the Commonwealth." ' We believe that, even though the fugitive water is included within the definition of 'waters of the Commonwealth,' it is still mine drainage. Mine drainage does not cease to be mine drainage once mining has ceased in the mine from which it continues to drain." 452 Pa. at 91, 306 A.2d at 316.

*Black,* 363 Pa. 231, 69 A.2d 376 (1949). To permit appellant to avert responsibility for abating a nuisance which it created under the proposition that it may abandon its enterprise, rather than operate such enterprise within the parameters of the environmental regulations, would nullify the environmental policy of this Commonwealth. We cannot say that, in light of the severity of harm which may occur from the continued discharge from Mine No. 15 of the acid mine water into the waters of the Commonwealth, the remedy ordered by the Commonwealth Court is an unreasonable exercise of the police power.

■■ The police power of the state is as comprehensive as the demands of society require under the circumstances. *See Stephens v. Bonding Association of Kentucky,* 538 S.W.2d 580 (Ky.1976); *People v. K. Sakai Co.,* 56 Cal.App.3d 531, 128 Cal.Rptr. 536 (1976). Indeed, given our determination that the Commonwealth is validly employing its police power in a reasonable manner to abate the immediate public nuisance, there can be no finding of an unconstitutional "taking" by the imposition of the present abatement order, despite the impact this exercise of the police power may have on the appellant. *See, e. g., Erie Railroad Company v. Board of Public Utility Commissioners,* 254 U.S. 394, 41 S.Ct. 169, 65 L. Ed. 322 (1921); *Hadacheck v. Los Angeles,* 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915); *Ramey Borough v. Commonwealth, Department of Environmental Resources,* 466 Pa. 45, 351 A.2d 613 (1976); *Commonwealth v. Emmers,* 221 Pa. 298, 70 A. 762 (1908); *Bortz Coal Company v. Commonwealth,* 2 Pa.Cmwlth. 441, 279 A.2d 388 (1971); *Commonwealth v. Town of Hudson,* 315 Mass. 335, 52 N.E.2d 566 (1943). "[T]he very essence of the police power (as distinguished from the power of eminent domain) is that the deprivation of individual rights and property without compensation cannot prevent its operation, so long as its exercise is proper

and reasonable." *People v. K. Sakai Co.*, 56 Cal.App.3d 531, 538, 128 Cal.Rptr. 536, 541 (1976). This distinction was explained by the United States Supreme Court in *Mugler v. Kansas*, 123 U.S. 623, 668–69, 8 S.Ct. 273, 301, 31 L.Ed. 205 (1887):

> "A prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking or an appropriation of property for the public benefit. . . . The power which the States have of prohibiting such use by individuals of their property as will be prejudicial to the health, the morals, or the safety of the public is not—and, consistently with the existence and safety of organized society, cannot be—burdened with the condition that the State must compensate such individual owners for pecuniary losses they may sustain, by reason of their not being permitted, by a noxious use of their property, to inflict injury upon the community."

Thus, we find that restrictions or obligations imposed on the use or ownership of property to protect the public health, safety or morals from dangers threatened, if reasonably necessary to dispel the particular danger, do not constitute a taking.

It must be noted that despite ample opportunity to do so, no effort was made by appellant to offer additional evidence on remand to show that either (1) there was an alternative means of abating the nuisance which was more reasonable than that ordered by the court, or (2) the remedy imposed was unduly oppressive due to its economic impact. In fact, the Commonwealth Court found and we accept that "the only known effective abatement order which can be entered in this case is to direct the pumping and treatment of the acid mine water accumulating in Mine No. 15 . . . ." [13] The appellant, there-

13. 23 Pa.Cmwlth. at 512, 353 A.2d at 480.

fore, has failed to carry its burden of proof on the issue of the unconstitutionality of the remedy imposed. Our review of the record and the findings of the Commonwealth Court lead us to conclude that the remedy ordered by the Commonwealth Court is neither unreasonable nor unduly oppressive. *Cf. Miller v. Schoene,* 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (1928); *Ramey Borough v. Commonwealth, Department of Environmental Resources,* 466 Pa. 45, 351 A.2d 613 (1976).

The final decree of the Commonwealth Court is affirmed.

MANDERINO, J., did not participate in the consideration or decision of this case.