Commonwealth of Pennsylvania, Department of Environmental Resources *v.* Pennsylvania Power Company, Appellant.

Argued February 2, 1977, before President Judge Bowman and Judges Crumlish, Jr., Kramer, Wilkinson, Jr., Mencer, Rogers and Blatt. Judge Kramer did not participate in the decision.

*William R. Balph, Jr.,* with him *Chambers, O'Neill, Nicolls, Balph & Paul,* for appellant.

*David T. Buente,* Assistant Attorney General, for appellee.

OPINION BY PRESIDENT JUDGE BOWMAN, April 4, 1978:

This is an appeal by Pennsylvania Power Company (PPC) of an adjudication by the Environmental Hearing Board dated April 16, 1976, assessing civil penalties in the amount of $195,400 against PPC for numerous violations of the particulate matter and sulfur dioxide ($SO_2$) emission limitation standards[1] promulgated by the Department of Environmental Resources (DER).[2]

---

[1] The regulations which PPC was found to have violated were promulgated in 1972. The relevant emission limitation for particulate matter may be found at 25 Pa. Code §123.11. The relevant emission limitation for $SO_2$ may be found at 25 Pa. Code §123.22.

[2] It should be noted that this appeal also serves as a foreboding warning of the approach of what will in all likelihood become one of the most complex issues of contemporary environmental law. This centers on the treatment to be afforded energy-producing public utilities for the technologically unavoidable pollution of our environment. Most recently captioned "Energy versus the Environment," this conflict results from present-day technology's inability to permit compliance with current "technology forcing" pollution stan-

Contributing to the complexity of this case is the confusion created by the long tortuous history of litigation between the parties to this suit over the Commonwealth's air quality program pursuant to the Air Pollution Control Act (APCA), Act of January 8, 1960, P.L. (1959) 2119, *as amended*, 35 P.S. §4001 et seq., and the rules and regulations promulgated thereunder. To facilitate an understanding of this case it is essential to provide an account of these prior legal proceedings. Additionally, for reasons of clarity this opinion will discuss separately each type of violation committed by PPC (*i.e.*, particulate matter and $SO_2$).

## BACKGROUND INFORMATION

PPC is an energy-producing public utility company certificated to operate in the general territory of

---

dards being legislatively advocated on both federal and state levels. This "technology forcing" policy results from the 1970 amendments to the Clean Air Act (CAA), 42 U.S.C. §1857 et seq., and the state legislation pursuant to these amendments. The CAA, in an effort to coordinate federal and state air pollution control action, required the Administrator of the E.P.A. to promulgate national primary and secondary ambient air quality standards. These in effect defined the maximum concentration of pollutants adversely affecting public health and welfare allowable in any given area. The CAA then required each state to adopt and submit to the Administrator for approval, an implementation plan designed to achieve these minimal standards. Once approved, these plans became enforceable by both federal and state authorities, with primary enforcement responsibility resting with the states. That a "technology forcing" policy decision was, in fact, legislated, is interpolated by that language in the CAA, which requires that state implementation plans afford compliance with the primary ambient air quality standard "in no case later than three years from the date of approval of such plan." 42 U.S.C. §1857c-5(a)(2)A(i). Two excellent articles on this aspect of the CAA are Bleicher, *Economic and Technical Feasibility in Clean Air Act Enforcement Against Stationary Sources*, 89 HARV. L. REV. 316 (1975), and Cannon, *Technology Forcing Under The Clean Air Act: The Electric Utility Dilemma*, 38 U. PITT. L. REV. 505 (1976).

Western Pennsylvania. PPC distributes electricity to its customers from five coal-fired steam boilers located in Taylor Township, Lawrence County, Pennsylvania. In April of 1970, the Pennsylvania Department of Health[3] ordered PPC to install air pollution control equipment and/or to implement process changes designed to limit its boilers' particulate matter emissions. The objective of this order was to bring PPC's boilers in compliance with the then existing particulate matter emission limitation known as Regulation V. The Pennsylvania Air Pollution Commission[4] had established this emission limitation on January 28, 1969. Regulation V required particulate collection efficiency to 99 percent.[5] PPC's boilers at this time were equipped to remove particulate matter to only a 98 percent efficiency.

PPC, acting under the belief that the Commonwealth's particulate matter emission limitations would soon be made more stringent and that the Commonwealth would also undertake the regulation of $SO_2$ emissions, appealed this order to the Pennsylvania Air Pollution Commission. It argued before the Commission that compliance with the Department of Health's order should not be required until it was determined whether or not the standards under Regulation V would remain viable. The Commission rejected this argument and affirmed the Department's order on January 11, 1971. The Commission, however, extended the date on which PPC was to submit

---

[3] The Department of Health was predecessor to DER in responsibility for enforcement of the Commonwealth's air pollution laws.

[4] The Pennsylvania Air Pollution Commission was succeeded under the APCA by the Environmental Quality Board, Section 5 of the APCA, 35 P.S. §4005.

[5] As of that date, the Commonwealth had not yet commenced the regulation of $SO_2$ emissions.

an abatement plan and schedule for compliance until June 1, 1971. This date for compliance was later extended by agreement of the parties to September 1, 1971. PPC did not appeal from the Commission's order nor did it ever attempt to comply with it.

Thereafter, the Commonwealth on January 12, 1972, filed a complaint in equity in the Court of Common Pleas of Lawrence County, pursuant to Section 10(a) of the APCA, 35 P.S. §4010(a). This was done in an effort to compel PPC's compliance with Regulation V, as required under the Commission's January 1971 order. On January 27, 1972, the Environmental Quality Board, as anticipated by PPC, abolished Regulation V by amending the regulations with respect to particulate matter emissions and enacted new regulations pertaining to the control of $SO_2$ emissions.[6]

Notwithstanding these events, the hearing on the Commonwealth's complaint in equity was held on February 22, 1972. The scope of the hearing, however, went beyond the issues raised in DER's complaint. The trial court took judicial notice of the fact that since the Commission's January 1971 order, the particulate matter emission limitations had become more stringent and that the Commonwealth also had begun the control of $SO_2$ emissions.[7] Consequently, the court issued an order on August 7, 1972, which required PPC to file with DER within 60 days for its approval, an application plan for compliance with the new emis-

---

[6] It is the violation of these new regulations that are at the heart of this appeal. *See supra* note 1.

[7] These new standards promulgated by the Environmental Quality Board were likewise submitted on January 31, 1972, to the Administrator of the Environmental Protection Agency. They were subsequently approved as part of the Pennsylvania Implementation Plan pursuant to the Clean Air Act amendments of 1970. *See supra* note 2.

sion standards. The order also required operational compliance with the new regulations by July 1, 1975. As to Regulation V, it was provided that in lieu of PPC being required to apply for a variance for noncompliance with the Department of Health's 1970 order pertaining to that standard, a supplemental order would be issued setting forth specific actions to be taken by PPC. This supplemental order was issued by the court in December of 1972 and directed PPC to burn coal containing a low ash content until compliance with the new regulations was obtained. This same order provided specific penalties for failure to burn such coal.

PPC chose not to appeal the orders of the lower court and submitted a timely application and plan for abatement to DER for approval. This proposed plan suggested the installation of additional electrostatic precipitators which would remove greater amounts of particulate matter from PPC's boilers' flue gas. The plan stated that this action would allow PPC to meet the new particulate emission limits set under 25 Pa. Code §123.11. As to PPC's required compliance with the $SO_2$ emission limitation under 25 Pa. Code §123.22, however, the plan was less optimistic. Regarding this standard, PPC did not suggest the installation of any type of pollution equipment ostensibly designed to limit the emission of $SO_2$. Rather, PPC indicated in its application that the state of the art of $SO_2$ removal was so unreliable that it was in effect technologically impossible to meet the new DER standard. PPC suggested that to install equipment designed to this end would be futile and wasteful.[8] The application there-

---

[8] This writer would like to note that expenditures for inoperable pollution devices would most likely be passed on to the consumers of utilities by means of rate increases legitimately brought about by the resulting increase in capital outlay. It would appear that expenditures of this type should perhaps be examined by the

fore proposed the construction of high stacks so as to disperse the $SO_2$ emitted higher into the atmosphere in an effort to meet ambient air quality standards.[9] Actual emission reduction of $SO_2$ was not suggested in PPC's plan.

DER never informed PPC whether or not its proposals were acceptable as was impliedly required by the trial court's order. PPC was also never requested to provide any additional information to DER in an effort to satisfy any questions which may have existed pertaining to the application. Rather, DER without any further inquiry chose to treat PPC's application as contemptuous of the lower court's 1971 orders. As a result of this decision, two new legal actions were initiated against PPC by DER.

On November 20, 1972, DER filed a contempt petition in the Court of Common Pleas of Lawrence County naming PPC and its President, Ray E. Semmler, as respondents. The petition asked for the incarceration of Semmler as well as a fine of $25,000 per day against both. It was further requested in the petition that these penalties continue until a plan was submitted by PPC which would assure attainment of the Commonwealth's particulate matter and $SO_2$ emission standards in compliance with the lower court order of August 7, 1972. Additionally, on December 18, 1972, DER commenced a four-count civil penalty action before the Environmental Hearing Board (Board) against PPC for alleged numerous violations of vari-

---

Public Utility Commission whose duty it is to protect the public interest.

[9] High stacks work only to control ground level concentrations of $SO_2$ by dispersion of the pollutant higher into the atmosphere. The state and thereby the federal standard to be achieved is an emission standard. This can only be accomplished, if at all, by the removal of $SO_2$ from the flue gas by use of lime scrubbers or by the reduction of $SO_2$ in the gas by the use of low sulfur fuels.

ous DER pollution control regulations.[10] It is the appeal from the decision in this civil penalties action that is now before this Court.

The hearing before the Board on the action for civil penalties was continued pending the determination of DER's contempt petition. In January of 1973, a five day hearing on the contempt petition was held in the Lawrence County Court of Common Pleas. During the hearing both sides produced substantial technical, scientific and engineering evidence exclusively on the question of $SO_2$ removal.

In its opinion, the court made it clear that it did not reach the question of PPC's application as it pertained to suggestions for the removal of additional particulate matter and found that desulfurization techniques were not such as to enable PPC by any means to comply with DER's emission limitation. Inasmuch as the court found it technologically impossible for PPC to limit its $SO_2$ emissions, the court concluded that PPC's application was not submitted in contempt of its August 1972 order. This determination was upheld on appeal.[11]

FACTS OF ADJUDICATION ON APPEAL

Immediately following the disposition of the contempt proceeding, the hearing before the Board on DER's action for civil penalties was rescheduled. Count I of this action alleged violations of former

---

[10] This civil penalties action only became available to DER shortly before it was filed. The addition on October 26, 1972, of Section 9.1 of the APCA, 35 P.S. §4009.1, allowed DER to bring such a civil penalties action against anyone who violated any provision of the APCA, or a rule or regulation of the Board, or order of the department.

[11] See Department of Environmental Resources v. Pennsylvania Power Co., 12 Pa. Commonwealth Ct. 212, 316 A.2d 96 (1974), aff'd, 461 Pa. 675, 337 A.2d 823 (1975).

Regulation V, Count II alleged violations of 25 Pa. Code §123.11, limiting particulate matter emission, Count III alleged violations of 25 Pa. Code §§123.41-.43, pertaining to visible emission limitations and Count IV alleged violations of 25 Pa. Code §123.22, limiting $SO_2$ emissions.

After initial consideration and dismissal of preliminary matters raised by PPC, the Board on February 4, 1974, conducted a hearing on the merits of the action. Upon the evidence adduced during this hearing and upon consideration of the legal effects of the various prior legal proceedings between the parties, the Board formulated its adjudication. The net result was that the Board assessed civil penalties against PPC in the amount of $195,400 pursuant to Section 9.1 of the APCA, 35 P.S. §4009.1, for numerous violations of DER Regulations 123.11 and 123.22 from November 1972 through November 1973.

In determination of its assessment, the Board dismissed Count I of the complaint pertaining to PPC's violation of Regulation V. The Board concluded that although the evidence demonstrated that a violation of that regulation had occurred, the court of common pleas orders of September and December of 1972, requiring PPC to burn low ash coal in lieu of filing for a variance, in effect granted PPC a variance to its required compliance with Regulation V.[12] The Board also dismissed Count III of the complaint pertaining

---

[12] Moreover, it should be noted that this variance via court order was actually made at the behest of DER. DER suggested to the court that if such were not provided for in its order, PPC would be compelled to apply for a variance or both parties would necessarily return to court. The Board correctly noted in its adjudication that permission for a variance in this manner is not provided for in either the APCA or DER rules and regulations. Despite the lack of procedure, however, the Board found that the lower court's order could not be ignored.

to alleged violations of DER's visible emission standards. The failure of DER to present any evidence in proof of this count prevented any possible finding that PPC violated this standard. The assessed penalties under Section 9.1 therefore were grounded only upon Counts II and IV of the civil penalties complaint. Section 9.1 of the APCA reads:

In addition to proceeeding under any other remedy available at law, or in equity, for a violation of a provision of this act, or a rule or regulation of the board, or an order of the department, the hearing board, after hearing, may assess a civil penalty upon a person for such violation. Such a penalty may be assessed whether or not the violation was wilful. The civil penalty so assessed shall not exceed ten thousand dollars ($10,000.00), plus up to two thousand five hundred dollars ($2,500.00) for each day of continued violation. In determining the amount of the civil penalty, the hearing board shall consider the wilfulness of the violation, damage or injury to the outdoor atmosphere of the Commonwealth or its uses, and other relevant factors. It shall be payable to the Commonwealth of Pennsylvania and shall be collectible in any manner provided at law for the collection of debt. If any person liable to pay any such penalty neglects or refuses to pay the same after demand, the amount, together with interest and any costs that may accrue, shall be a lien in favor of the Commonwealth upon the property, both real and personal, of such person, but only after same has been entered and docketed of record by the prothonotary of the county where such is situated. The hearing board may, at any time, transmit to the prothonotaries of the respective counties

certified copies of all such liens, and it shall be the duty of each prothonotary to enter and docket the same of record in his office, and to index the same as judgments are indexed, without requiring the payment of costs as a condition precedent to the entry thereof.

Upon consideration of the evidence presented at the hearing, the Board found that in 217 instances, PPC had violated 25 Pa. Code §123.11 limiting particulate matter emissions. Pursuant to the above section, a civil penalty was permissible for violation of this Board regulation. The Board assessed only a $100 penalty per violation, however, due to its determination that PPC enjoyed a variance as to any particulate matter emission up to that amount permitted under Regulation V standards. The Board determined that the difference between the allowable particulate matter emission under 25 Pa. Code §123.11 and that allowed under Regulation V was only five pounds per hour per boiler. In view of the minimal damage which this additional particulate matter could possibly cause and the fact that PPC was not found to have willfully violated Regulation 123.11, inasmuch as DER failed to respond to their application and proposals for particular matter abatement, the Board reasoned that a total penalty assessed of $21,700 under Count II of the complaint was warranted.

Likewise, under Count IV of the complaint the Board found that PPC had violated 25 Pa. Code §123.22, limiting $SO_2$ emissions, on 1,737 separate occasions. As to these violations, the Board again assessed a minimal penalty of $100 per violation against PPC, largely as the result of the determination of the Court of Common Pleas of Lawrence County that it was technologically impossible for PPC to comply with DER's $SO_2$ regulation. The Board thus viewed itself

as collaterally estopped from finding that the violations under this count were in any manner willful.

In review of the Board's adjudication, this Court is to determine whether there exists a manifest abuse of discretion or an error of law. Section 44 of the Administrative Agency Law, Act of June 4, 1945, P.L. 1388, *as amended*, 71 P.S. §1710.44, requires that we affirm the adjudication of the Board unless it is in violation of PPC's constitutional rights, or there exists an error of law or a lack of substantial evidence to support any necessary finding of fact. *Department of Environmental Resources v. Bierman*, 23 Pa. Commonwealth Ct. 646, 648, 354 A.2d 48, 50 (1976). On appeal, PPC requests reversal of the Board's adjudications raising arguments under each one of the three available grounds. Initially, we examine these arguments solely as to their application to Count II and PPC's violation of the particulate matter emission limitation as established under 25 Pa. Code §123.11.

PARTICULATE MATTER VIOLATIONS

PPC's contention that the Board erred as a matter of law is based upon the Board's rejection of various legal defenses raised by PPC, which, if valid, would prohibit the imposition of penalties. PPC first argues that the prior legal determination in the contempt proceeding disallows the assessment of any civil penalty under Section 9.1 on the basis of the res judicata and collateral estoppel effects of the lower court's determination that it was technologically impossible to comply with its prior order of August 1972. This argument as it applies to PPC's violations of the DER particulate matter emission limitation is without merit.

In *McCarthy v. Township of McCandless*, 7 Pa. Commonwealth Ct. 611, 617, 300 A.2d 815, 820 (1973), this Court stated that four elements must exist if res judicata is to prevail: "(1) Identity in the thing sued

upon or for; (2) Identity of the cause of action; (3) Identity of persons and parties to the action; and (4) Identity of the quality or capacity of the parties suing or sued." The Court in *McCarthy* also stated that for purposes of res judicata, *"there is identity of causes of action when in both the old and new proceedings the subject matter and the ultimate issues are the same."* *Id.* at 618, 300 A.2d at 820 (emphasis in original.) Initially, it is noted that the lower court's determination in the contempt proceedings specifically excluded as an issue PPC's application as it pertained to the Commonwealth's particulate matter emission standards. The sole issue resolved in the contempt proceeding relevant to this appeal was that it was impossible for PPC to meet the Commonwealth's $SO_2$ emission standards. This determination cannot in any manner be given relevance to the imposition of fines for PPC's violation of DER's particulate matter regulation. Additionally, ignoring the court's limitation of its decision, the "thing sued for" in the contempt proceeding was different than that sued for in this civil penalties action. The contempt action was seeking the submission of a plan for abatement on the behalf of PPC in keeping with the lower court's order. The incarceration and fines requested by the petition were only a means to obtain such action. In this instance, DER seeks to impose monetary penalties on PPC for specific violations of the Commonwealth's particulate matter emission standards and the resulting pollution of the Commonwealth's air caused by these violations. These penalties are largely intended to prevent future pollution but also work to provide the Commonwealth with compensation.[13] Based upon

___

[13] It is noteworthy that PPC has never contended that it is impossible to comply with DER's particulate matter emission standard. Indeed, PPC's application and plan for abatement proposed means which would bring its boilers into compliance with Regulation 123.11.

these factors we do not believe that in this instance the imposition of civil penalties under Section 9.1 of the APCA for violation of the Commonwealth's particulate emission standards is barred by res judicata.

Under a similar theory, PPC's alternate contention that collateral estoppel works to prevent the imposition of civil penalties for its violation of Regulation 123.11 also must fall. The doctrine of collateral estoppel operates to prevent an inconsistent conclusion in a legal proceeding as to any issues decided in a prior proceeding which "(1) are identical; (2) were actually litigated; (3) were essential to the judgment (or decree, as the case may be); and (4) were 'material' to the adjudication." *McCandless, supra* at 619, 300 A.2d at 820-21. Our prior discussion pertaining to res judicata makes it obvious that no relevant issue of the Board's imposition of civil penalties for PPC's violation of Regulation 123.11 was ever passed upon in any prior legal proceeding between these two parties. The doctrine of collateral estoppel is for this reason inapplicable.[14]

PPC next contends that under the doctrine of election of remedies, DER should be estopped from bringing this civil penalties action. PPC's contention is that the equity suit brought by DER in February of 1972, to compel compliance with the original adjudication by the Air Pollution Commission, and the subsequent contempt petition in November of 1972, seeking incarceration and monetary penalties, preclude this

---

[14] By way of anticipation, it is noted that the doctrine of collateral estoppel is applicable to this appeal as it pertains to the imposition of civil penalties for violation of the $SO_2$ limitation standard. This results from the trial court's determination during the contempt proceeding that it was impossible for PPC to comply with this emission standard. Our determination here is only applicable to the imposition of civil penalties for violation of DER's particulate matter regulation.

further action under Section 9.1 of the APCA for civil penalties. PPC argues that to allow the imposition of the penalties in this instance would produce inconsistent results as well as allow DER to violate the rule against multiplicity of action. We cannot agree with PPC's reasoning.

The wording of Section 10(e) of the APCA, 35 P.S. §4010(e), provides: "The penalties and remedies prescribed by this act shall be deemed concurrent and the existence of or exercise of any remedy shall not prevent the department from exercising any other remedy hereunder, at law or in equity." Likewise, Section 9.1 reads: "In addition to proceeding under any other remedy available at law, or in equity, for a violation of . . . a rule or regulation of the board . . . the hearing board, after hearing, may assess a civil penalty upon a person for such violation." It is apparent from this specific language that the legislature intended to provide DER with several means of prohibiting pollution, none of which was intended to be exclusive. Furthermore, after careful consideration of each one of the previous legal proceedings involved, we must conclude that none of the proceedings sought inconsistent remedies nor can the results actually obtained be considered inconsistent. The equity action of August 1972 was brought to compel compliance with the Commonwealth's air pollution regulations. The contempt petition of November 1972 was initiated to obtain adherence to the court's subsequent order requiring submission of an abatement plan. Finally, this civil penalties action of December 1972 was initiated to recover damages for specific violations of the Commonwealth's pollution emission regulations which caused excessive particulate matter to be emitted into the atmosphere and to inhibit future pollution. We believe that these various actions are indeed supportive of each other, but inasmuch as they relate to PPC's violation of

Regulation 123.11, the actions are not repetitive[15] or inconsistent. The independent impetus to each cause of action, resulting from the dissimilarity in the thing sued "upon or for," prevents the doctrine of election of remedies from precluding this action for civil penalties under Section 9.1.

The case relied upon by PPC, *Department of Environmental Resources v. Leechburg Mining Co.*, 9 Pa. Commonwealth Ct. 297, 305 A.2d 764 (1973), is inapposite. In that case, an administrative order was issued which required Leechburg Mining to take certain steps so that compliance with several pollution control acts could be obtained. The parties entered into a subsequent partial consent adjudication on that order from which no appeal was taken. Thereafter, a new action in equity was brought by DER to obtain abatement of the identical alleged violations for which the parties entered into the consent adjudication. In such an instance, it is entirely possible that inconsistent remedies may result. Where as here, however, the remedies actually obtained are supportive but not inconsistent or duplicative, it is inappropriate to invoke the doctrine of election of remedies. *Nuside Metal Products, Inc. v. Eazor Express, Inc.*, 189 Pa. Superior Ct. 593, 152 A.2d 275 (1959).

PPC next contends that the Board committed an error of law by failing to find that the lower court order of August 1972 granted a complete variance to PPC as to all particulate matter violations upon the submission of its abatement plan to DER. As noted previously, the Board found that a variance had been granted by this order, but only as to particulate mat-

---

[15] It should be noted that the cumulative remedy of civil penalties for specific violations of pollution regulations, either prior to or subsequent to the submission of an air pollution abatement plan is also in keeping with the "technology forcing" posture of the APCA and CAA. *See supra* note 2.

ter emissions up to those amounts allowed under Regulation V. The Board refused to find that a variance had been granted PPC as to particulate matter emissions in excess of those allowed under Regulation V.

This contention can best be resolved by viewing the lower court's order of December 12, 1972, providing for the actions PPC was to take in lieu of applying for a variance to Regulation V. That order was issued subsequent to the October 26, 1972 enactment of Section 9.1 of the APCA. This section clearly provides that civil penalties for a violation of any regulation under the Act are to be a cumulative remedy. Notwithstanding this unambiguous language, the order specifically stated that a variance was granted only as to the Air Pollution Commission's adjudication of January 11, 1971, pertaining to Regulation V. This limitation, the language of Section 9.1 and the fact that all variances as to any pollution standard must normally be obtained by the procedures set forth in 25 Pa. Code §141 et seq. compels this Court to conclude that no variance was intended by the court order as to the standards under Regulation 123.11. To conclude otherwise would also render Section 9.1 ineffective as a "technology forcing" tool.

Finally, PPC suggests that the court's adjudication in the contempt proceeding somehow provided a future variance for any violation which may occur of Regulation 123.11. As stated previously, the lower court specifically excluded as an issue in its adjudication in that proceeding, PPC's plans for compliance with the Commonwealth's particulate matter emission standards. Additionally, as had previously been discussed, civil penalties for specific violations of a regulation are a cumulative remedy. The court's determination in the contempt proceeding, therefore, should not be viewed as providing in any manner a variance to 25 Pa. Code §123.11.

We conclude that the Board committed no error of law in its adjudication of assessing civil penalties against PPC for particulate matter emission limitations.

The next argument advanced by PPC is that crucial findings of fact of the Board are not supported by substantial evidence. The specific findings in contention are numbers 35, 36 and 37, which provide:

35. The quality of the ambient air downwind of defendant's generating station was in general significantly more deteriorated than was the air quality upwind of the said station.

36. The results of DER's ambient quality sampling program clearly show that the emissions from the defendant's boiler are a significant factor in determining the quality of the ambient air in the vicinity of defendant's generating plant.

37. Inasmuch as the emissions from defendant's generating facility in Taylor Township, Lawrence County, Pennsylvania, make a significant contribution to the quality of the outdoor atmosphere in the vicinity of the plant, there is no resonable expectation that the air quality therein can reach the national ambient air quality standards with regard to particulate matter and sulfur dioxide unless and until the emissions from defendant's stacks are controlled to such an extent that they do not exceed the particulate matter or sulfur dioxide limitations set forth in DER regulations.

Substantial evidence is such evidence as a reasonable mind would accept as adequate to support a conclusion. *Department of Environmental Resources v. Bierman, supra* at 648, 354 A.2d at 50. The evidence presented in the hearing relevant to the issue of PPC's

violation of particulate matter emission regulations was extensive. The record reveals from data supplied by PPC that the particulate emissions of PPC's boilers during the period November 1, 1972 through November 1, 1973, were in violation of 25 Pa. Code §123.11. PPC does not dispute this evidence other than to suggest that the evidence utilized to determine these violations was supplied by itself and not by the DER. This fact, however, does not subtract from its relevancy. Additionally, the Board made several other findings of fact relevant to this issue, which are also supported by substantial evidence. Though these particular findings are not contested by PPC, they support contested findings numbered 35 and 36. They indicate that DER established six ambient air quality sampling stations in and around the vicinity of PPC and that PPC's boilers emitted such amounts of particulate matter as to produce significantly higher average readings of particulates in the air at the sampling stations located downwind of PPC. We conclude from this evidence that findings numbered 35 and 36 are supported by substantial evidence.

There appears to be less evidence in support of finding number 37. This is particularly true in reference to that portion of the finding which suggests Pennsylvania's future inability to comply with federal particulate ambient air levels if PPC's violations continue.[16] This Court need not, however, address this question. We have concluded that findings numbered 35 and 36 are supported by substantial evidence. We

---

[16] In this regard, finding number 34 by the Board, the only finding which pertains to the violation of national particulate ambient air quality standards, indicates that at sampling station number 3 there was only one recorded level of particulate matter emission which exceeded the federal ambient air quality standard during the period in question. The federal standards allow for the violation of the particulate matter standard once per year. 40 C.F.R. §50.7.

believe that these findings in and of themselves are sufficient to allow for the imposition of the penalties assessed for violation of Regulation 123.11. This belief is based upon two factors. Section 9.1 allows the imposition of a penalty for violation of any rule or regulation of the Board. It is clear from the evidence that Regulation 123.11 was indeed violated by PPC. Additionally, this Court believes that the purpose behind the APCA is to obtain the cleanest air possible. Though the significance of this belief will be more fully explained in our discussion of the constitutional issues raised by PPC, it is sufficient at this time to state that this conclusion renders finding number 37 nonessential to the Board's adjudication. As we must affirm the Board's adjudication unless a "necessary finding of fact" is unsupported by substantial evidence, *Department of Environmental Resources v. Bierman, supra,* PPC's argument is without merit.

We turn now to the constitutionality of the penalties imposed against PPC for its violation of 25 Pa. Code §123.11. The argument posed by PPC is that the assessment of these penalties, without a showing that the federal ambient air quality standards have also been violated, is to deprive PPC of its constitutional rights to due process and equal protection under the laws. The essence of this argument is that regulation under the police power must be reasonably related to the protection of a valid public interest. PPC contends that the valid public interest involved in this instance in no manner requires or is protected by Regulation 123.11.

In explaining the constitutional standard which is to be applied in determining a proper exercise of police power, the Court in *Commonwealth v. Harmar Coal Co.,* 452 Pa. 77, 93, 306 A.2d 308, 317 (1973), applied the test set forth in *Lawton v. Steele,* 152 U.S. 133, 136-37 (1894) : "To justify the state in . . . inter-

posing its authority in behalf of the public, it must appear, first, that the interests of the public . . . require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals." Debatable questions as to reasonableness are viewed as questions for the legislature and not for the courts. *Goldblatt v. Hempstead*, 369 U.S. 590 (1962). We also note that in view of the various elements of police power, "one who challenges the constitutionality of the . . . state's police power, affecting a property interest, must overcome a heavy burden of proof to sustain that challenge." *Commonwealth v. Barnes & Tucker Co.*, 472 Pa. 115, 123, 371 A.2d 461, 465 (1977).

In analyzing whether the civil penalties imposed in this instance fall within the constitutional test set forth in *Lawton v. Steele, supra,* we must examine two questions. The first is whether the public interest requires such interference and the second is whether the means used are reasonably necessary for the accomplishment of the purpose without being unduly oppressive.

It is first necessary to determine the public interest involved. Courts scrutinizing the regulatory power of the states determine the meaning of "valid public interest" according to the facts of each case. As stated by the Supreme Court in *Commonwealth v. Harmar Coal Co., supra* at 92, 306 A.2d at 316, the term has a very broad scope: "A State in the exercise of its police power may, within constitutional limitations, not only suppress what is offensive, disorderly or unsanitary, but enact regulations to promote the public health, morals or safety and the general well-being of the community. Bacon v. Walker, 204 U.S. 311 (1907)." PPC argues that the public interest behind the APCA is the attainment of the federal ambient air quality standards. DER contends that the purpose behind the statute is something more than the attain-

568

ment of the federal standards. It contends that the public interest involved is the attainment of clean air to that degree set by its regulations. In other words, the federal primary and secondary ambient air quality standards are minimums which may be and are intended by the Commonwealth in this instance to be surpassed. After careful consideration of the CAA, the APCA and the pertinent legislative histories thereto, we must agree with DER and conclude that the purpose behind the APCA and the provisions contained therein is to provide the people of this Commonwealth with air which is of a higher quality than that required by federal law.

Examining this purpose, there is little doubt that the reduction of air pollution to such a degree is a valid public interest. In speaking on this same question in the case of *Bortz Coal Co. v. Commonwealth*, 2 Pa. Commonwealth Ct. 441, 444-45, 279 A.2d 388, 391 (1971), this Court pointed out that the regulation of air pollution has long been a valid public interest.

[I]t should be pointed out that the law has been concerned with air pollution for centuries. As early as 1306, A.D., the use of 'sea-coal' (as distinguished from charcoal) as fuel was forbidden on penalty of death. City of Portland v. Lloyd A. Fry Roofing Company, 472 P.2d 826 (1970) and Air Pollution: Its Control and Abatement, Kennedy and Porter; 8 Vand. L. Rev. 854 (1954-55). During her reign, Queen Elizabeth of England forbade the burning of coal in London during sessions of Parliament, and in 1661 A.D., there was a plan to remove all industries in the City of London to its leeward side and to plant sweet-smelling flowers and trees on the windward side. See Fumifugium, National Smoke Abatement Society, Manchester, England (1953). Blackstone (Book

III, Chapter 13, pages 167 and 217) describes the legal problems of a lead smelter, the fumes from whose plant were a nuisance, killing the neighboring farmer's corn. See 77 Eng. Rep. 816 and Appeal of Pennsylvania Lead Company, 96 Pa. 116 (1880). (Footnote omitted.)

The first prong of the *Lawton* test, therefore, is satisfied with respect to Section 9.1 of the APCA allowing for the imposition of civil penalties for violation of DER air pollution Regulation 123.11.

The question upon which we must now focus is whether the means used are "reasonably necessary for the accomplishment of the purpose and not unduly oppressive." This question as applied in the context of this case translates into whether the assessment of civil penalties is reasonably related to the attainment of the public interest involved. PPC's argument that it is not so related is grounded upon Board finding number 34 that the evidence does not show a violation of federal ambient air quality standards by PPC's emissions. Contending that it is these federal standards which are being protected, PPC argues that this finding demonstrates that DER Regulation 123.11 is not reasonably related to the protection or accomplishment of this standard. It would logically follow, therefore, that the imposition of civil penalties to induce compliance with the regulation is also not reasonably related to the service of the public interest involved.

Our conclusion that the APCA is designed to go beyond federal ambient air quality standards makes PPC's argument unacceptable, as it is unnecessary to show that a violation of federal ambient air quality standards has occurred prior to the imposition of civil penaltites under Section 9.1. In fact, Board finding number 34 is rendered meaningless in view of such a conclusion. To constitutionally impose civil penalties

under Section 9.1, it is necessary to show a specific DER emission standard and PPC's violation of this standard. Under such a situation, the penalties imposed as a result of the violation work to prevent the continued emission of pollutants. In this sense, the imposition of these penalties regulates particulate matter pollution which is reasonably related to the accomplishment of the public purpose involved; *i.e.*, the attainment of air which is 99% particulate free.

In conclusion, the regulation of air pollution is legitimately within the public's interest. The fines imposed in the instance of PPC's violation of particulate matter are reasonably necessary to accomplish the regulation of particulate matter pollution. The record shows that PPC submitted a plan to DER which indicated that Regulation 123.11 would be met by the installation of additional electrostatic precipitators on its boilers. In view of the fact that the particulate matter regulations in this instance are obtainable,[17] the imposition of civil penalties for PPC's noncompliance with such regulations is appropriate in all respects. This becomes even clearer in view of the "technology forcing" posture of the APCA and DER enforcement of that Act. We find PPC's constitutional due process argument to be without merit.

PPC also contends that the imposition of civil penalties for emitting excessive amounts of particulate matter also violates its right to equal protection under the laws as guaranteed by the Fourteenth Amendment of the U.S. Constitution. PPC has failed to

---

[17] This is not to infer that the promulgated DER air quality standard requires only utilization of that technology which is presently proven. It seems clear that the "technology forcing" aspects of the CAA and APCA require something more. The actual length to which a polluter must extend to fulfill these "technology forcing" standards, however, is as yet unclear and we do not decide that question at this time.

show, as it must to establish even the threshold basis of an equal protection argument, that in the enforcement of its Regulation 25 Pa. Code §123.11, DER engaged in intentional and purposeful discrimination against them. *Oyler v. Boles,* 368 U.S. 448 (1962); *Commonwealth v. Barnes & Tucker Co.,* 455 Pa. 392, 416 n. 14, 319 A.2d 871, 884 n. 14 (1974). Without this minimal requirement being satisfied, we need not decide this equal protection argument.

Having examined the arguments raised by PPC against the Board's imposition of fines for violation of 25 Pa. Code §123.11 pertaining to particulate matter emissions, we conclude that there is no reversible error in that part of the Board's adjudication.

## SO$_2$ EMISSION VIOLATIONS

We now turn to PPC's identical arguments as they pertain to the Board's imposition of civil penalties for violation of 25 Pa. Code §123.22, regulating SO$_2$ emission limitations. After careful examination of these issues, we conclude that here the imposition of penalties is in violation of PPC's constitutional rights. We shall, therefore, address only this question.

Crucial to our resolution of this issue is the trial court's finding on DER's petition for contempt that it was impossible for PPC to comply with the Commonwealth's current SO$_2$ emission limitation due to the inadequacy of current technology. The Board correctly found as a result of this determination that it was collaterally estopped from reaching a different conclusion on this question. Under *Lawton, supra,* the means used in providing for the public interest involved must be reasonably necessary for the accomplishment of the purpose and not unduly oppressive. Mr. Justice STEARN, later Chief Justice, in speaking to this point, stated in *Commonwealth v. Zasloff,* 338 Pa. 457, 460, 13 A.2d 67, 69 (1940), that "the means

which [a regulation] employs must have a real and substantial relation to the object sought to be attained. . . ." (Citations omitted.) Though the imposition of penalties for violation of DER's particulate matter emissions was found to be appropriate in every respect under this aspect of the *Lawton* test, a similar determination is unwarranted for the imposition of civil penalties for the violation of DER Regulation 123.22.

It is settled that the public interest lies in attaining air quality with an $SO_2$ level of that established under 123.22. The lower court's determination, however, indicates that such an emission level is *technologically impossible* for PPC to attain. It is clear from this conclusion that the imposition of civil penalties under Section 9.1 for excessive $SO_2$ emissions does nothing to protect the public interest involved.[18] The penalties can pose no deterrence as to future $SO_2$ pollution by PPC. Nor can the penalties be utilized to clean the air polluted by PPC's past violations as no present technology is capable of accomplishing that result. The only use which an assessment under Regulation 123.22 can serve is to provide financing for DER's operations, as all such civil penalty assessments must be deposited into the Commonwealth Clean Air Fund.[19]

---

[18] This is not to infer, however, that DER Regulation 123.22 is not reasonably related to the attainment of the public interest involved or that it is unduly burdensome. We offer no judgment as to either of these questions. It is apparent that Regulation 123.22 can reasonably relate to the attainment of the public interest involved, if DER used the regulation as a means to close down violators of the standard. It is noted that DER is not attempting to shut down PPC in regulation of $SO_2$ emissions in the Commonwealth. No doubt such actions are an effective means of controlling $SO_2$ emissions so as to meet 123.22. It appears furthermore that the "technology forcing" aspects of both the CAA and the APCA would allow such action.

[19] Section 9.2 of the APCA, 35 P.S. §4009.2.

Under such an examination, it cannot rationally be contended that the effect obtained by Section 9.1 penalties substantially furthers the professed purpose behind the legislation. *See State v. Finney*, 65 Idaho 630, 150 P.2d 130 (1944); *State v. Stahlman*, 81 W.Va. 335, 94 S.E. 497 (1917). Any intended regulatory aspect of the civil penalties assessed under Regulation 123.22 fails to further any public interest. We conclude in this instance that the imposition of civil penalties for violation of Regulation 123.22 are in violation of PPC's constitutionally protected property rights.

As the imposition of civil penalties against PPC for violation of Regulation 123.22 violates its constitutional rights, we reverse the Board's adjudication in this respect. [20, 21]

Judge KRAMER did not participate in the decision in this case.

## ORDER

Now, April 4, 1978, the adjudication of the Environmental Hearing Board, No. 72-428-CP-C, dated April 16, 1976, assessing civil penalties against Pennsylvania Power Company in the amount of $21,700.00 for violation of 25 Pa. Code §123.11 is affirmed. The adjudication insofar as it assesses civil penalties against Pennsylvania Power Company in the amount of $173,700.00 for violation of 25 Pa. Code §123.22 is reversed.

---

[20] We only decide here the question of the imposition of civil penalties where it is technologically impossible to comply with an emission standard. Once technology is sufficiently developed to effectively reduce $SO_2$ emissions, a different question presents itself. Similarly, we do not intend to suggest that a similar result would necessarily follow upon a showing of economic impossibility.

[21] This case, following the death of Judge KRAMER, who had originally been assigned to it, was reassigned to President Judge BOWMAN.